Argued October 15, 1958, affirmed April 22, petition
for rehearing denied May 20, 1959

# SOUTHERN PACIFIC COMPANY *v.* MORRISON-KNUDSEN COMPANY ET AL

338 P. 2d 665

*Arno H. Denecke,* Portland, argued the cause for appellants. On the briefs were Mautz, Souther, Spaulding, Denecke & Kinsey, Portland.

*Oglesby H. Young,* Portland, argued the cause for respondent. On the brief were Koerner, Young, McCulloch & Dezendorf and James C. Ingwersen, Portland.

Before PERRY,* Chief Justice, and WARNER, SLOAN and O'CONNELL, Justices.

WARNER, J.

This is an action to recover judgment under a contract for indemnity wherein the plaintiff, Southern Pacific Company, is the indemnitee, and the de-

---

* Chief Justice when case was argued.

fendants, Morrison-Knudsen Company, Inc., Peter Kiewit Sons' Company and Macco Corporation, joint venturers, together were doing business as Morrison-Kiewit-Macco, are the indemnitors.

We will hereinafter refer to plaintiff as the Railroad and to defendants as the Industry. In so doing we adopt the terms by which they are respectively described in the agreement under review. From a judgment in favor of the Railroad after trial by the court without a jury, the Industry appeals.

The defendant joint venturers are corporations engaged in the construction of what is known as the Lookout Point Reservoir Project near the Railroad's Carter Station, in Lane County, Oregon.

As an incident to the construction project, the Industry and the Railroad entered into what is commonly called an "Industrial Spur Track Agreement."

Section 12 of the agreement provides:

"Industry is hereby permitted at its own expense to install and maintain an unloading bunker under said Track in the location shown on the attached print. Said bunker shall be constructed and maintained at all times in a manner satisfactory to Railroad and shall be kept securely covered at all times when not in use by Industry. Industry hereby agrees to indemnify and save harmless Railroad, its agents, successors and assigns from all liability, cost and expense resulting directly or indirectly from the presence or use of said bunker."

Pursuant to the contract, the Industry installed a bunker which was partly over and partly under a spur of the Railroad specially constructed near the point of the Industry's operations to facilitate the unloading of gondola cars carrying cement for the Industry's use.

To insure better weather protection for the unload-

ing operations, the Industry constructed a wooden overhead housing at the end of the spur directly over the unloading bunker. Over the forward end of this structure through which the cement laden cars were backed, the Industry hung a canvas curtain which could be raised or lowered as necessary so as not to interfere with the ingress of loaded cars and egress of empty ones. The agreement provided the maintenance of certain clearances as established by the Public Utilities Commissioner of Oregon. The one of concern here was for a minimum overhead clearance of 22 feet to conform to such overhead clearance requirements. Unfortunately, neither the wooden housing nor the curtain were of a sufficient heighth above the spur track.

Recourse to the indemnity provision arises from the fact that on November 12, 1952, one James A. White, an employee of the Industry's subcontractor, sustained personal injuries while employed in the bunker.

With respect to White's misfortune, the trial court found that both litigants "were equally guilty of active, concurrent negligence proximately causing the injuries of James A. White." After unhitching a gondola car loaded with cement, it appeared to White that the brake wheel of the next car would snag the curtain upon egress. White mounted this car, placed his left arm around the brake wheel, and prepared to lift the curtain. The train proceeded forward slowly. Although testimony is conflicting as to whether his fall was caused by contact with the curtain or was induced by a jerking movement of the train, the record is crystal clear that the accident and the Railroad's consequent liability resulted "directly from the use of said bunker."

The controlling issue presented is whether under

the indemnity clause the Railroad is entitled to indemnity for damages for injuries sustained by White resulting from the Railroad's negligence.

White thereafter sued the Railroad in the United States District Court for Oregon, where he recovered a judgment in the amount of $5,000. That judgment has been satisfied. In this action, the plaintiff Railroad seeks to recover from the Industry the amount of that judgment, plus costs and attorneys' fees.

The defense of White's action against the plaintiff Railroad was tendered by the Railroad and refused by the Industry.

After the trial of this matter before the late Judge Mundorff, he filed an opinion holding that White's injuries were the proximate result of the concurrent negligence of the Industry and the Railroad. He died before his formal findings could be entered. The case was thereafter tried before Judge Sulmonetti on the same record who adopted Judge Mundorff's opinion and entered findings of fact and conclusions of law in harmony with it. These were followed by the judgment from whence the Industry appeals.

The appellants challenge three of the trial court's Findings of Fact and six of its Conclusions of Law.

It is sufficient for the moment to observe that, generally speaking, the Industry's grounds for appeal are interlaced with references to principles of common-law tort doctrines of negligence in their relation to the right of contribution between parties having some degree of responsibility for a given accident, involving concepts of what may constitute passive or active negligence as between them.

Despite the Railroad's presentment of a claim for contractual indemnification, the Industry points to

cases purporting to stand for familiar ex delicto formulas as foreclosing recovery under the instant facts. *Astoria v. Astoria & Columbia River R. Co.,* 67 Or 538, 136 P 645 (1913) is an example of such reliance.

On the other hand, the consistent thread of the Railroad's argument rests upon and represents that if indemnity is forthcoming, it must necessarily flow as a result of the contractual privity between the parties. Indemnity is not supportable, nor is it claimed by the Railroad, to lie within the ambit of ex delicto postulates. The Railroad insists that tort principles concerning the nature and the degree of conduct are not apposite. It contends for the exclusive application of ex contractu doctrines. The Railroad's position, as will later become evident, is supported by the overwhelming authority from other jurisdictions. For the reasons which follow, we embrace this theory.

Since this case is one of relative novelty in this court, and confusion is introduced by an attempt to commingle tort and contract doctrines, we will first proceed with a discussion of those assignments having relevance to the nature and type of action involved. Secondly, we will give attention to the question of whether the contract was intended to cover the type of loss upon which recovery is sought, and, lastly, we will consider the public policy aspects of the indemnity provisions of the agreement.

*Astoria v. Astoria & Columbia River R. Co.,* supra, is the leading case in this state expressing, in the absence of statute or agreement, the common-law rules as to the rights to contribution and indemnity. It resulted from the failure of the defendant railroad company there to lay its tracks level with the grade of an elevated street in the city of Astoria and to keep

the street crossing in good condition and repair. A pedestrian was injured because of the railroad's fault in this respect. She sued the city and recovered judgment for her injuries. The city thereafter brought suit against the railroad company, claiming a right of indemnity. The city recovered on the ground that the railroad was actively negligent, whereas the city was only passively negligent.

In the Astoria case there was no agreement of indemnity subsisting between the city and the railroad. The city's claim rested solely upon its common-law remedy.

In the opinion in Astoria, we observe a clear and succinct statement of the rules which would determine the instant Railroad's right to recovery, if a tort theory were pleaded and employed herein instead of a theory resting upon a contractual obligation of indemnity. These rules are embodied in the following statement:

> "The paramount question here involved is whether plaintiff and defendant stand as tortfeasors in an equal decree [sic] with respect to the wrong which caused the injury to Annie Anderson. If so, confessedly, plaintiff cannot maintain this action, as the rule is almost universal that joint wrongdoers standing *in pari delicto* cannot compel contribution. However, to work an inhibition, the parties must stand *in pari delicto,* and the fact that the parties stand *in delicto* each to the other will not foreclose contribution. * * *" (67 Or at 546)

Judge Pope in *Booth-Kelly Lbr. Co. v. Southern Pac. Co.,* 183 F2d 902 (9th Cir 1950) in his analysis of the Astoria case, points out that the common-law rule there referred to as governing joint wrongdoers standing *in pari delicto* has been restated in Restatement, Restitution § 102, as follows:

"Where two persons acting independently or jointly, have negligently injured a third person or his property for which injury both became liable in tort to the third person, one of them who has made expenditures in the discharge of their liability is not entitled to contribution from the other."

He also noted that the rule enforced in the Astoria case; that is, where the parties stand *in delicto* to each other, is restated in § 95 of the same work, where it reads:

"Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition."

To better aid in the understanding of what follows respecting the Railroad's rights under the indemnity agreement, we observe that had there been no agreement of that character, and the Railroad and the Industry standing as they do here in the relationship of parties *in pari delicto* as to the White accident, the Railroad could not have compelled indemnity against the Industry (See § 102, Restatement, supra). On the other hand, in the absence of such agreement, if the Railroad and the Industry were found to stand *in delicto* to each other, the Railroad could not recoup against the Industry unless it was shown to be passively negligent (as the city in the Astoria case) and the Industry actively negligent (See § 95, Restatement, supra).

In short, under the common-law rules, as reflected by the Astoria case and restated in the foregoing sec-

tions from Restatement, if the Railroad had been sued and a judgment had against it because of some accident resulting directly or indirectly from the presence of the Industry's bunker over and under its tracks, it would have only a very narrow and limited right to compel contribution from the Industry, i.e., if it could successfully demonstrate that the Industry was guilty of active negligence, and the Railroad's contribution to the injury was passive in character.

■ Later, we will explore the scope of the intent of the instant indemnity clause. Here, it is sufficient to say that we are of the opinion that the indemnity clause was intended to compensate the Railroad for losses and liabilities resulting from its own negligence. But at this juncture, we deem it appropriate to first bring to the fore the impact of such contractual protection on the common-law rules which the Industry invokes in whole or in part to its aid.

■ We find that the error of Industry's argument lies in its failure to recognize that the common-law tort principles of negligence and alleged acquiescence by the Railroad as barring indemnity or contribution have no general application in an ex contractu action. *Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.,* 355 US 563, 569, 78 S Ct 438, 2 L ed2d 491 (1958); *Ryan Stevedoring Co. v. Pan-Atlantic SS. Corp.,* 350 US 124, 132, 133, 76 S Ct 232, 100 L ed 133 (1955); *Booth-Kelly Lbr. Co. v. Southern Pac. Co.,* supra (183 F2d at 906); *Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co.,* 199 F2d 725, 731 (8th Cir 1952); *Buffa v. General Motors Corp.,* 131 F Sup 478, 480 (ED Mich 1955); *Foster v. Pennsylvania R. Co.,* 104 F Sup 491, 492, n 1 (aff'd 201 F2d 727, 730 n 5 [3d Cir 1953]); *John P. Gorman Coal Co.*

*v. Louisville & N. R. Co.,* 213 Ky 551, 281 SW 487, 489 (1926); *Chicago Great Western Railway Co. v. Farmers Produce Co.,* 164 F Sup 532 (D Iowa 1958). See, also, *Filipek v. Moore-McCormack Lines, Inc.,* 156 F Sup 854, 858 (ED NY 1957); *Russell v. Shell Oil Co.,* 339 Ill App 168, 89 NE2d 415, 417 (1949); *Stern v. Larocca,* 49 NJ Super 496, 506, 140 A2d 403 (1958).

The Railroad's cause of action against the Industry is not based on tort, nor is its right to recovery dependent upon negligence. The alleged liability of the Industry arises from breach of the indemnity provision of the contract. The common-law rules which the Industry urges us to apply are not available because of its obligation "to indemnify and save harmless Railroad * * * from all liability, cost and expense resulting directly or indirectly from the presence or use of said bunker."

Notwithstanding the existence of an indemnity covenant, we are not unmindful of the Railroad's right to have elected a theory of recovery predicated upon the tort principles expounded in Astoria, supra. *Chicago Great Western Ry. Co. v. Farmers Produce Co.,* supra (164 F Sup at 537); *O'Dowd v. American Surety Co.,* 3 NY2d 347, 165 NYS2d 458, 144 NE2d 359, 361. But this it did not do.

■ When a contractual theory is employed to effectuate recovery, the common-law tort doctrines of contribution and indemnity are abrogated or superseded for the purpose of determining liability, although the contractual claim arises out of a liability flowing from the indemnitee's negligent conduct. As was said in *Union Pacific R. R. Co. v. Bridal Veil Lbr. Co.,* 219 F2d 825 (9th Cir 1955), at p 832: "* * * the rights

of indemnity, if any, must be found in the contract which supersedes the common law of Oregon (insofar as the contract contravenes it) by specifically dealing with the subject." See, also, *Buffa v. General Motors Corp.,* supra (131 F Sup at 480); *Southern Pacific Co. v. Fellows,* 22 Cal App2d 87, 71 P2d 75, 77 (1937); *City of Cleveland, Ohio v. Baltimore & O. R. Co.,* 71 F2d 89, 91 (6th Cir 1934); *Northern Pac. Ry. Co. v. Thornton Bros. Co.,* 206 Minn 193, 288 NW 226 (1939); *Allen v. J. G. McDonald Chocolate Co.,* 62 Utah 273, 218 P 971, 974; *Russell v. Shell Oil Co., Inc.,* supra (89 NE2d 415).

■ When the contractual obligation supersedes the common-law rules respecting the rights to indemnification or contribution by one of two negligent parties there is another consequence to contractual indemnification which the appellant Industry ignores. In that area the application of the theories of "active" and "passive," as well as "primary" or "secondary," negligence become inappropriate. *Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc.,* supra (355 US 563); *Chicago Great Western Ry. Co. v. Farmers Produce Co.,* supra (164 F Sup at 538); *Ryan Stevedoring Co. v. Pan Atlantic SS. Corp.,* supra (350 US 124); *Filipek v. Moore-McCormack Lines, Inc.,* supra (156 F Sup 854); *Russell v. Shell Oil Co.,* supra (89 NE2d 415). Cf. *Oleszcuk v. Calmar Steamship Corp.,* 164 F Sup 628, 632 (D Md 1958).

■ Since the parties themselves dealt with the question of indemnity in their written contract, we think it fair to say, as did the court in the Booth-Kelly case, supra, "that they intended it [the contract], rather than some general common law rule, to govern their rights and liabilities in this situation."

The intent of the parties respecting the scope of the indemnity agreement presents the paramount problem for solution on this appeal. It is brought to the fore by the Industry's challenge to the following conclusion of law made by the trial court:

"It was the intention of the parties in executing the above mentioned Indemnity Agreement that defendants should indemnify plaintiff for loss or injury resulting from the presence or use of said bunker."

■ As a general proposition, indemnity agreements are not construed to cover losses to the indemnitee caused by his own negligence unless such effect is expressed clearly and unequivocally. *Southern Pacific Co. v. Layman,* 173 Or 275, 279, 145 P2d 295 (1944); *Glens Falls Indem. Co. v. Reimers,* 176 Or 47, 53, 155 P2d 923 (1945); *U. S. Fid. & Guar. Co. v. Thomlinson-Arkwright Co.,* 172 Or 307, 324, 141 P2d 817 (1943). But the rule announced in these cases has been applied varyingly depending on the terms of the contracts and the nature of the parties involved.

At the outset, we observe that we know of no Oregon cases which hold that a railroad cannot protect itself by an indemnity agreement from the consequences of its own negligence not arising from its operations as a common carrier. Early recognition of this right to enjoy such species of self-protection will be found in *Honeyman v. Oregon and California R. R. Co.,* 13 Or 352, 10 P 628 (1886); *Richmond v. Southern Pacific Co.,* 41 Or 54, 67 P 947 (1902). The only case involving a railroad contract for indemnification in connection with the indemnitor's use of a railroad right-of-way is *Southern Pacific Co. v. Layman,* 173 Or 275, 145 P2d 295 (1944). The case at bar is the first instance

of a contract of indemnification arising out of use of a spur track.

The indemnity provision in the Layman case is substantially like that which we review here. It reads:

"Licensee shall and hereby expressly agrees to indemnify and save harmless the Licensor and its lessor from and against any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever, resulting directly or indirectly from the maintenance, presence or use of said crossing." (173 Or at 276)

Referring to this clause, the court observed at page 281:

"The language of the indemnity clause under consideration is undoubtedly broad and general enough to include loss caused solely by the plaintiff's negligence, but similar language has not deterred the courts from finding that no such meaning was intended by the parties."

The court then proceeded to examine circumstances and conditions peculiar to that case (to which we will hereinafter more particularly refer) which warranted its ultimate conclusion that, notwithstanding the inclusive breadth of the foregoing clause, standing alone, it was not the intent of the parties that it operate to include indemnity against the railroad's acts of negligence.

Much is said in the briefs of both parties concerning *Southern Pacific Co. v. Layman,* supra. The Industry leans heavily upon it as an authoritative answer to its contentions.

We adhere to the doctrines expressed in Layman, but in so doing, and without departing from anything there said, we find it easy to distinguish it from the case at bar.

■ In search for the intent of the parties to the Southern Pacific-Layman indemnity agreement, the court gives prime consideration to the avoidance of "the harsh results which would follow from an interpretation imposing liability on the indemnitor for negligence of the indemnitee" (173 Or at 280). Such "harshness" was measured by the following circumstances there evident, but not necessarily present in other indemnity transactions to which the railroad was a party. In Layman, the court took countenance of: (1) the relative status of the parties, particularly, in a financial sense; (2) the relative scope of the privilege accorded Layman; and (3) the degree of additional liability assumed by the Railroad by reason of the privilege conferred on the indemnitor.

Relative to elements of scope and status of the privilege secured by the indemnitee in Layman, we concluded that the right enjoyed by Layman was "the mere privilege of passing over the [Railroad's] tracks." (173 Or at 283) In return for this narrow right, we held it was not intended by the parties that Layman should assume the hazard of Railroad's negligence. For, as there said, "It could result in subjecting a farmer to a ruinous liability arising out of the negligence of the [Railroad] in the operation of its trains, * * *." In short, the imposition of indemnity for the negligence of the Railroad under those circumstances would be an excessive price for the "mere privilege" returned.

■ Turning to the instant matter, we find that at least one of the defendants comprising the Industry, Morrison-Knudsen Company, Inc. (and possibly the other corporate defendants), is one of the great construction companies of the country. It has been long

identified with the building of projects of great magnitude, public and private, in the United States and elsewhere.

Nor are we able to say here, as in Layman, that the Industry here acquired a "mere privilege" in the sense of an occasional and relatively unimportant use.

The spur track to the Railroad's main line was on the Railroad right-of-way and about 1,462 feet long. At the end was the bunker built over the spur. All this was an accommodation to the Industry and for the Industry's sole use to facilitate delivery of cement to its construction job. There was no comparable compensating advantage to the Railroad. It created a situation wholly unlike the Railroad's operation under the Layman agreement. The success of no part of Layman's use or activities were directly or indirectly dependent upon any kind of service from the Railroad. Here, however, the Industry was dependent to a large degree upon the cooperation of the Railroad, without which the bunker would have been of little or no value to it. The Railroad not only had to deliver the cars loaded with cement to the bunker area, but could not detach and leave them for dumping to and until the Industry's agents "spotted" and signaled the precise location for dumping into that part of the bunker below the tracks. This was the function of Mr. White at the time of the accident and had been long prior thereto.

The construction of the track crossing for the convenience of Layman was not one inherently hazardous. It added a "comparatively small risk." From the exhibits we glean that the bunker was a structure of considerable size, about 50 feet long and 30 feet wide, substantially constructed over and under the tracks.

The testimony and the exhibits, particularly the

several photographs of the bunker, justify the conclusion that the presence of the bunker, constructed and operated as it was by the Industry on railroad property, created new and latent risks and hazards for injuries to property or persons operating in or near it. Such risks and hazards were not usual to the Railroad's ordinary operation as a common carrier. Moreover, they were risks arising from a privilege that the Railroad was not legally obligated to confer on the Industry. Although in no sense conclusive of the bunker's hazardous character, in this appeal it is of interest to note that "bunkers" are characterized as hazardous operations under our Workmen's Compensation Law. ORS 656.084(2).

We cannot say in this matter that there is any justification for the application of the rule against harshness which warranted the result in Layman. In the case at bar there is a sharp difference between the status of Layman and the defendant Industry. Here, the privilege conferred on the Industry falls far short of being a "mere privilege" with a "comparatively small risk."

Thus, it will be seen that by suffering the Industry to erect and operate the bunker, the Railroad exposed itself to the hazards of an increased, immeasurable tort liability. Under the circumstances, it was only natural and the exercise of sound business judgment that the Railroad would demand protection including the consequences of its own acts.

Concluding, as we do, that it was the intent of the parties that the Railroad be absolutely indemnified with respect to "all liability, cost and expense resulting directly or indirectly from the presence or use of said bunker," that intent would be frustrated if the obligation were construed to be qualified by the

kind or degree of fault or negligence causally related to the accident, so long as it was precipitated by any matter related directly or indirectly to the presence or use of the bunker. *Stern v. Larocca, supra* (49 NJ [App Div] at 507); *Russell v. Shell Oil Co., supra* (89 NE2d at 417); *Buffa v. General Motors Corp., supra* (131 F Sup at 484); *Northern Pac. Ry. Co. v. Thornton Bros. Co., supra* (288 NW at 228).

Indeed, unless the Railroad is entitled to indemnity the contractual provision would be a useless gesture. For we perceive of no other kind of a claim for which the Railroad could be indemnified by the Industry except for one founded in whole or in part upon its own negligence. *Louisville & N. R. Co. v. Atlantic Co.,* 66 Ga App 791, 19 SE2d 364 (1942); *Houston & T. C. R. Co. v. Diamond Press Brick Co.,* 111 Tex 18, 222 SW 204, 226 SW 140; *Booth-Kelly Lbr. Co. v. Southern Pacific Co., supra* (183 F2d 902); *Cacey v. Virginian Ry. Co.,* 85 F2d 976, 978 (4th CA 1936).

In a word, the most striking overall difference between Layman and the case at bar lies in the fact that Layman was not a "spur track" case. In that area of railroad operation there is a growing body of distinctive law which gives force to our conclusions here and which are not applicable to situations like that reported in Layman.

The Oregon cases, i.e., Layman, Reimers and Thomlinson-Arkwright Co., supra, are marshaled in support of the Industry's thesis that indemnity agreements will not be construed to cover losses arising out of the indemnitee's own negligence. A cursory examination of these cases might lead to the conclusion that nothing short of a flat statement in plain language will suffice to extend the benefits of the indemnity agree-

ment for losses sustained by the indemnitee because of its own negligence.

We submit a close and careful analysis of these Oregon cases, as well as the spur-track cases cited from other jurisdictions, reveals the fallacy of the Industry's argument and conclusions respecting them.

We know that had the Southern Pacific's negligence been at least passive and no indemnity agreement in issue, the Railroad could have recovered its losses upon familiar common-law tort principles. *Astoria v. Astoria & Columbia River R. Co.,* supra (67 Or at 548). But if we give full force to the Industry's argument that the indemnity must in clear and unequivocal language state that its protection includes negligent acts of the Railroad, then we must also conclude in the absence of such a plain, flat statement that the Railroad could recover nothing under the instant agreement for liability arising from tort actions, even though its participation in the asserted negligence was only passive in character. Such a construction would render the indemnity provision inoperative, meaningless and innocuous.

If, on the other hand, we temper the apparent scope of the Industry's argument, and would hold that the instant clause is only a restatement of the common-law right of indemnification, thus limiting the Railroad's right to recovery only to instances of its passive negligence, the provision becomes mere surplusage, for under such construction the Railroad would acquire no greater rights of indemnity than it already enjoyed and could enforce without recourse to such a covenant.

We do not think the parties here intended such an idle gesture by the inclusion of the recovery provision. Unless the parties intended to embrace liabilities

resulting from the Railroad's negligence, it can have no meaning.

"By the overwhelming weight of authority, something less than an express reference in the contract to losses from the indemnitee's negligence as indemnifiable will suffice to make them so if the intent otherwise sufficiently appears from language and circumstances." *Stern v. Larocca,* supra (49 NJ Super at 503-4).

Consistent with the stress of Oregon authorities cited by the Industry for the need of "unequivocal terms," we feel that the indemnity proviso here is clear, certain, and sufficiently broad and comprehensive, so as to warrant only the conclusion that the true intendment of the agreement was to save Southern Pacific harmless from its negligence under these circumstances.

This conclusion is also supported by the following "spur track" cases where the indemnitor was contractually bound to the indemnitee for damages flowing from the latter's own negligence: *Louisville & N. R. Co. v. Atlantic Co.,* supra (19 SE2d at 370); *Houston & T. C. R. Co. v. Diamond Press Brick Co.,* supra (222 SW at 205); *Terminal R. Ass'n. of St. Louis v. Ralston-Purina Co.,* 352 Mo 1013, 180 SW2d 693, 697 (1944); *Buckeye Cotton Oil Co. v. Louisville & N. R. Co.,* 24 F2d 347 (6th Cir 1928); *Gollick v. New York Central R. Co.,* 138 F Sup 384 (ED Mich 1956); *Buffa v. General Motors Corp.,* supra (131 F Sup 478). See, also, other cases cited at 20 ALR2d 715 (1951) and Sup Serv, p 1252 (1957).

The courts in the Buckeye, Gollick and Buffa cases, supra, have had little difficulty in awarding indemnification upon the same principles of interpretation.

In *Buckeye Cotton Oil Co. v. Louisville & N. R. Co.,*
supra (24 F2d 347), the clause was strikingly similar
to the one at bar. It was a provision to hold the Rail-
road "* * * harmless from the claims and demands
of any and all persons on account of any damages or
injuries caused directly or indirectly by the existence,
location, or condition of any structure or obstruction
* * *."

Here, as we have previously pointed out, the con-
ditions which warranted the limitations applied in
the Layman case do not exist, and we find no condi-
tions which would result in harshness as to the in-
demnitor-Industry.

One of the Industry's assignments is addressed to
the court's Conclusion of Law III, reading: "The con-
tract is not void or invalid on the ground that it is
contrary to public policy."

■ The question of whether an agreement to indem-
nify against the indemnitee's negligence is void as
against public policy has never received a categorical
answer in this state. We, however, concur in the
observation made by the court in *Oregon Portland
Cement Co. v. E. I. DuPont De Nemours & Co.,* 118
F Sup 603, 607 (Or DC 1953) that:

> "* * * The case of Southern Pacific Co. v.
> Layman, 1944, 173 Or. 275, 145 P.2d 295, partic-
> ularly when construed with Glens Falls Indemnity
> Co. v. Reimers, 1945, 176 Or. 47, 155 P.2d 923, indi-
> cates that such contracts are not void as against
> public policy in Oregon."

According to modern case and textual statements,
the great weight of authority holds that parties to
such exculpatory agreements may validly bind them-
selves to indemnify the indemnitee against liability

founded upon his own negligent conduct. *Griffiths v. Henry Broderick, Inc.*, 27 Wash2d 901, 182 P2d 18, 175 ALR 1 (1947); *Northern Pac. Ry. Co. v. Thornton Bros. Co.*, supra (288 NW at 228); *Union Pacific R. R. Co. v. Bridal Veil Lbr. Co.*, supra (219 F2d at 832); *Buffa v. General Motors Corp.* (131 F Sup at 482); 27 Am Jur, Indemnity § 9, as amended by 1958 Cum Sup, p 163; 17 CJS 645, Contracts § 262, and cases cited in 1958 Appendix, p 128, under note 97; 175 ALR Annos, p 25.

■ More specifically, a railway company acting in a private role and not as a common carrier may legally contract for indemnification against the consequences of its own negligence not criminal or wanton in nature. *Cacey v. Virginian Ry. Co.*, supra (85 F2d at 978); *Southern Pacific Co. v. Layman,* supra (173 Or at 278); 13 CJS 229, Carriers § 117. Cf. *Honeyman v. Oregon and California R. R. Co.*, supra (13 Or at 357); *Richmond v. Southern Pacific Co.*, supra (41 Or at 57). This postulate is equally applicable to contractual indemnity embodied in spur track arrangements. *Louisville & N. R. Co. v. Atlantic Co.*, supra (19 SE2d at 371); *Houston & T. C. R. Co. v. Diamond Press Brick Co.*, supra (222 SW at 206); *Missouri, K. & T. Ry. Co. of Texas v. Carter*, 95 Tex 461, 68 SW 159, 165; *John P. Gorman Coal Co. v. Louisville & N. R. Co.*, supra (281 SW at 489); 175 ALR Annos 102.

In reaching this result, courts variously assign different reasons. Some stress an analogy between the kind of indemnity agreements now under consideration and liability insurance policies. *Terminal R. Ass'n. of St. Louis v. Ralston-Purina Co.*, supra (180 SW2d 696). Others reach the same conclusion by reference to the "freedom of contract" when a railroad is not acting in its character as a common carrier (*Mis-*

*souri, K. & T. Ry. Co. of Texas v. Carter,* supra [68SW at 164]) or by simply stating that such contracts are not void as against public policy *(Union Pac. R. R. Co. v. Bridal Veil Lbr. Co.,* supra (219 F2d at 832). See, also, 175 ALR Annos, pp 25-28, and with particular reference to contracts of indemnity respecting spur tracks and sidings, pp 102-105.

■ In conclusion and in answer to the question relating to the validity of indemnity agreements of the kind under review, we adopt as the rule in Oregon the following statement from 6 Corbin on Contracts (1951), 864 § 1471:

> "A railroad or other carrier may lawfully contract with one permitted to use a spur track or to occupy part of the right of way that the latter shall not only exempt the former from liability for negligent harm but also that the latter shall indemnify the former against liability for harm to third persons arising out of such use, even though the harm was caused by negligence of servants of the former. This assumes that the promisee's negligence was not in performance of its duties as a common carrier."

The judgment of the lower court is affirmed.