**RYAN MERCANTILE COMPANY, Plaintiff,**

v.

**GREAT NORTHERN RAILWAY COMPANY, Defendant.**

**Civ. No. 2104.**

United States District Court
D. Montana,
Great Falls Division.

Aug. 31, 1960.

Anderson, Symmes, Forbes, Peete & Brown, Billings, Mont., for plaintiff.

Weir, Gough & Booth, and Ward A. Shanahan, Helena, Mont., for defendant.

JAMESON, District Judge.

This is an action for declaratory judgment, in which both parties have moved for summary judgment. There is no issue of fact, and the determination of the case depends upon the construction of a lease agreement between Ryan Mercantile Company and Great Northern Railway Company.

The lease agreement is included in a carefully drawn instrument, twenty-one pages in length, entitled "Agreement to Lease, Remodel, Sell and Buy". It is divided into five major sections, the lease provisions appearing in the second section. The provisions pertinent to this case are:

"2. *Lease:*

"A) Premises:

"1) Great Northern leases, lets, and demises to Ryan those certain

662

premises situated in Great Falls, Cascade County, Montana, located and bounded as indicated by a red line on Exhibit "A" attached hereto and made a part hereof, together with all buildings and improvements, specifically including a building labeled machine shop, situated thereon, which for ease of reference is herein designated Ryan Tract.

"2) Great Northern grants to Ryan for the term of this lease and any extensions thereof the right to use, in common with Great Northern, a right of way not less than twenty (20) feet wide and equivalent in use to the rights enjoyed by the public in the use of public highways, for ingress to and egress from Ryan Tract by any and all means of locomotion or conveyance along the route located and bounded by green lines on Exhibit "A"; provided, however, that during the term hereof Great Northern may substitute for such right of way any other right of way of equal width, with comparable surface conditions and equal scope and convenience of use. Great Northern shall maintain the right of way according to the present standard of maintenance at its sole cost and expense.

\*     \*     \*     \*     \*     \*

"J) *Damages, Claims, and Loss—Contractual Liability:*

"1) Ryan shall indemnify and save Great Northern harmless from any and all personal injuries, damages, claims, suits, costs, and recoveries of every name and nature which may in any manner arise or grow out of the business conducted by Ryan on the leased premises, or the use or occupancy thereof by Ryan, or by other persons at Ryan's instance or with Ryan's consent or knowledge during the term of this lease, whether due or not due to the negligence of Great Northern, its contractors, officers, agents, and employees; and in the event any suit or action shall

be brought against Great Northern to recover on account of such loss, damage, injury, or destruction hereinbefore agreed to be borne by Ryan, Ryan shall appear and defend any such suit or action and pay any judgment that may be obtained against Great Northern.

"2) Ryan agrees to obtain and keep in full force and effect during the life of this contract, at its own sole cost and expense, a policy of public liability and property damage insurance protecting Great Northern against loss on account of injuries to or death of persons and loss of or damage to property which may in any manner arise or grow out of the business conducted by Ryan on the above-described property or the use and occupation of said property by Ryan or by other persons at Ryan's instance or with its consent or knowledge during the term of this lease, whether due or not due to the negligence of Great Northern, its contractors, officers, agents, and employees. Said insurance may be written by any standard insurance company chosen by Ryan and shall protect Great Northern against loss on account of injuries to or death of one person in the sum of One Hundred Thousand Dollars ($100,000) and for injuries to or death of more than one person in any one accident in the sum of Three Hundred Thousand Dollars ($300,000), and for damage to property in the sum of Fifty Thousand Dollars ($50,000)."

On December 31, 1958, Evelyn Burditt, the wife of an employee of Ryan, was injured while riding in a car being driven by her husband, when the car was struck by a boxcar being pushed by a switch engine of Great Northern, the accident occurring on the right of way described in paragraph 2(A) (2) of the agreement. Mrs. Burditt instituted suit against Great Northern, alleging in her complaint that no bells, warning lights, whistles, gongs, or other warning devices were given, all in violation of Section

72–219, R.C.M.1947,[1] and that there was no watchman or flagman at the crossing to warn her of the approaching switch train. Great Northern tendered defense of the action to Ryan. Ryan declined to accept the defense and instituted this action for a declaratory judgment to determine the rights of the respective parties under the lease agreement.

Plaintiff contends that Mrs. Burditt's claim and suit are not covered by the indemnity agreement in that: (1) the accident occurred on the right of way described in paragraph 2(A) (2) and that the right of way is not a part of the "leased premises" within the meaning of paragraphs J(1) and (2); (2) that it was not the intention of the parties that Ryan should indemnify Great Northern for injuries occurring on property over which Great Northern retained possession and control; (3) that it was not the intention of the parties that Ryan should indemnify Great Northern for accidents caused by the sole negligence of Great Northern employees at a place where Great Northern had the duty to provide safeguards; and (4) that the indemnity provisions are void as against public policy and the statutes of Montana.

■ Is the right of way a part of the "leased premises"? This question must be answered in the affirmative. The section of the instrument denominated "2.

Lease" has sixteen subsections, from A to P inclusive. Subsection A is entitled "Premises". This in turn has three subparagraphs, the first leasing an area bounded in red on an exhibit attached to the lease, "together with all buildings and improvements", and the second granting a right of way for use "in common with Great Northern" for "ingress and egress" along a route bounded in green, and providing that Great Northern should have the right to substitute other land for the right of way and should maintain the right of way at its own expense.

The right of way is included under A as a part of the "premises". There is no contention that the right of way is a public highway. Ryan, and those doing business with Ryan, are entitled to use the right of way in common with Great Northern solely by reason of the grant contained in paragraph 2(A) (2). This grant of an easement was an integral and necessary part of the lease agreement if Ryan were to enjoy the use and occupancy of the land and improvements described in paragraph 2(A) (1).[2] Moreover, unless the parties intended the right of way to be a part of the leased premises, there would be no reason for including the portion of the agreement granting the right of way under the heading "A. Premises".[3]

---

1. Section 72–219, R.C.M.1947, provides in pertinent part: "If any railroad corporation * * * shall permit any locomotive to approach any highway, road or railroad crossing, without causing the whistle to be sounded at a point between fifty and eighty rods from the crossing, and the bell to be rung from said point until the crossing is reached * * * shall be deemed guilty of a misdemeanor * * *."

2. It is alleged in paragraph II of the Burditt complaint that this right of way "is the only means of ingress to and egress from said machine shop and said Ryan Mercantile Company office and warehouse".

3. City of Oakland v. Oakland Unified School District, 1956, 141 Cal.App.2d 733, 297 P.2d 752, upon which plaintiff relies, is distinguishable. There the defendant school district had leased an arena of a municipal auditorium for a music festival. There was no reference to any walks or other means of ingress and egress. The claimant was injured on a walkway providing access to one of the entrances to the building. In holding that the indemnity agreement did not cover the walkway the court called attention to the fact that the agreement covered only the "arena", that the means of the ingress and egress were not exclusive but would have to be shared with the general public, and that if the parties had intended that the pathway outside the building was to be included in the indemnity clause, "it would have been a very simple matter for the plaintiff in drawing the lease to so provide". Here it was so provided by including the right of way under the heading "2. Lease. A. Premises".

■ Is Ryan's indemnity agreement limited to injuries occurring on property over which Ryan had the right to exclusive possession and control? The agreement does not so provide. On the contrary, Ryan agreed to indemnify Great Northern against all claims and suits "which may in any manner arise or grow out of business conducted by Ryan on the leased premises, or the use and occupation thereof by Ryan, or by other persons at Ryan's instance or with Ryan's consent or knowledge * * *" Mrs. Burditt was accompanying her husband, who was an employee of Ryan. The claim "grew out of the business conducted by Ryan on the leased premises" and "its use and occupancy thereof" by Ryan. Coupled with the express provision that the indemnity provision is applicable "whether due or not due to the negligence of Great Northern * * *", it is clear that the indemnity provisions are not limited, as plaintiff contends, to premises in the exclusive possession and control of Ryan.

■ Did the parties intend that Ryan was to indemnify Great Northern for claims resulting from accidents caused by the sole negligence of Great Northern employees at a place where Great Northern had a duty to provide safeguards against such accidents? It is true, as plaintiff contends, that to impose liability upon an indemnitor for the negligence of the indemnitee, the intention of the parties must be expressed in clear and unequivocal terms.[4] Here the language of the lease agreement itself is clear and unambiguous, expressly providing for indemnity where the claim grows out of the business conducted by Ryan on the leased premises, or its use and occupancy of the premises, "whether due or not due to the negligence of Great Northern, its

* * * employees". It is difficult to conceive of a more sweeping indemnity provision. Moreover, the same language is repeated in subparagraph J(2) in providing that Ryan shall maintain a policy of public liability and property damage insurance "protecting Great Northern against loss on account of injuries" to persons and damage to property, although this paragraph refers to the "above described property" instead of the "leased premises".

A less specific indemnity clause was held sufficient in Bedal v. Hallack & Howard Lumber Company, 9 Cir., 1955, 226 F.2d 526, 539 to impose liability on the indemnitor lumber company for the negligence of the indemnitee railroad. The court said:

"The determination (by the trial court) that the lumber company was thus bound was based upon the provision of the lease reading as follows: 'It is especially covenanted and agreed * * * that the Lessee shall hold harmless the Lessor and the leased premises from any and all liens, fines, damages, penalties, forfeitures or judgments in any manner accruing by reason of the use or occupation of said premises by the Lessee; and that the Lessee shall at all times protect the Lessor and the leased premises from all injury, damage or loss by reason of the occupation of the leased premises by the Lessee, or from any cause whatsoever growing out of said Lessee's use thereof.' It would be hard to find more all-inclusive language. In view of this undertaking the lumber company was, as we have previously suggested, in a situation comparable to that of an insurer."[5]

---

4. See United States v. Wallace, 9 Cir., 1927, 18 F.2d 20; Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir., 1958, 257 F.2d 410; Ocean Accident & Guarantee Corp. v. Jansen, 8 Cir., 1953, 203 F.2d 682; but compare Rice v. Pennsylvania R. Co., 2 Cir., 1953, 202 F.2d 861; Booth-Kelly Lumber Co. v. Southern Pacific Co., 9 Cir., 1950, 183 F.2d

902, 20 A.L.R.2d 695; United States Steel Corp. v. Emerson-Comstock Co., D.C.N.D.Ill.1956, 141 F.Supp. 143 and cases cited therein at page 146.

5. In the absence of an express provision imposing liability for the negligence of the indemnitee, other tests must be applied to determine the intention of the

■■ The provisions of the lease in the instant case are unambiguous. It expressly provides for indemnity for claims and suits whether due or not due to the negligence of Great Northern, manifesting a clear intention that Ryan was to indemnify Great Northern for Great Northern's own negligence.[6] This court is not at liberty, under the guise of construction, to alter the contract of the parties. See Union Electric Company v. Lovell Livestock Company, 1936, 101 Mont. 450, 54 P.2d 112, where the Montana court construed an indemnity agreement.

■ Plaintiff next argues that a contract to indemnify the indemnitee for liability resulting from the indemnitee's sole negligence is invalid on the ground that it is contrary to public policy. Many early cases so held. See 27 Am.Jur. 460, Indemnity § 9. But under the weight of authority today such contracts are valid. See 27 Am.Jur.Supp. 144, Indemnity § 9, Notes 19 and 20; Annotation 175 A.L.R. 25.

The rationale underlying the modern rule was well stated by Judge Hoffman in United States Steel Corp. v. Emerson-Comstock Co., D.C.N.D.Ill., 141 F.Supp. 143, 145: "While there are early cases in some states expressing a public policy against indemnifying a tortfeasor for his own negligence it is today well established that the parties may so contract. Modern legal theory does not ignore the desirable objectives of accident prevention which motivated the earlier decisions. But it finds nothing in the financial arrangements by which the business community through insurance in indemnity agreements allocates losses, inconsistent with that objective. The one on whom the contract imposes the liability has the same incentive to prevent the losses." [7]

The modern rule is set forth in Restatement, Contracts § 574, as follows: "A bargain for exemption from liability for the consequences of negligence not falling greatly below the standard established by law for the protection of others against unreasonable risk of harm, is legal except in the cases stated in § 575."

Section 575 reads: "(1) A bargain for exemption from liability for the consequences of a wilful breach of duty is illegal, and a bargain for exemption from liability for the consequences of negligence is illegal if (a) the parties are employer and employee and the bargain relates to negligent injury of the employee in the course of employment, or (b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation * * *" The provisions of § 575 have no application in this case since the railroad, although a common carrier, was not bargaining with a member of the public to relieve itself from negligence in the performance of an act which it was required by law to perform for that person. It was acting in its capacity as a property owner, and not in its capacity as a common carrier.

The rule here applicable was well stated in 6 Corbin on Contracts 864, § 1471 as follows: "A railroad or other carrier

---

parties. See, for example, the recent case of Gray Line Company v. Goodyear Tire & Rubber Company, 9 Cir., 1960, 280 F.2d 294, where, in construing and reconciling cases arising in Oregon, the court called attention to the fact that one of the determining factors is whether "additional liability was assumed by the railroad by reason of the privilege conferred on the indemnitor". Where, as here, the intention is expressly stated, there is no need to apply any other tests.

6. This conclusion is also consistent with the tenor of the entire instrument. The property was leased at an annual rental of $240.00. All expenses arising from Ryan's use and occupancy of the premises were to be paid by Ryan.

7. For an exhaustive treatment of the subject see 175 A.L.R. 8. For cases dealing particularly with railroads see 175 A.L.R. 94. See also Southern Pacific Co. v. Morrison-Knudsen Co., 1959, 216 Or. 398, 338 P.2d 665, 675 and cases there cited.

may lawfully contract with one permitted to use a spur track or to occupy part of the right of way that the latter shall not only exempt the former from liability for negligent harm but also that the latter shall indemnify the former against liability for harm to third persons arising out of such use, even though the harm was caused by negligence of servants of the former.[8] This assumes that the promisee's negligence was not in performance of its duties as a common carrier."

Plaintiff relies strongly upon Otis Elevator Co. v. Maryland Casualty Co., 1934, 95 Colo. 99, 33 P.2d 974. The footnote to the text quoted from Corbin on Contracts states that this case "is hardly reconcilable with the text". In that case the owner of a building had agreed to indemnify Otis Elevator Company against claims arising by reason of injuries to persons while riding upon the elevator, however caused. The court held the indemnity provision invalid on the ground that it tended to promote a breach of duty to the public. While this case is distinguishable in some respects from the instant case, it does support plaintiff's position; but, as suggested by Corbin, it is contrary to the weight of authority.

█ Finally, plaintiff contends that as applied to the allegations in the Burditt complaint, the indemnity agreement is invalid under Section 13-802, R.C.M. 1947, which provides: "Certain contracts unlawful. All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or for wilful injury to the person or property of another, or violation of law, whether wilful or negligent, are against the policy of the law."

Does the contract here have for its object, either directly or indirectly, to exempt Great Northern from responsibility for its own violation of law, whether wilful or negligent? Mrs. Burditt is seeking recovery from Great Northern for Great Northern's negligence. One of the grounds of negligence is failure to give the warnings required by Section 72-219, R.C.M.1947 (set forth in note 1), which, if true, will establish negligence on the part of Great Northern. In many negligence cases, however, the plaintiff relies upon a violation of some statute to establish negligence. This does not mean that the object of an agreement to indemnify for the indemnitee's negligence, is to exempt indemnitee from "responsibility for" its "violation of law, whether wilful or negligent". Certainly the contract here does not involve the commission of a crime, either as a consideration therefor or in the performance thereof; nor does it tend to the violation of law. Great Northern is not seeking indemnity for any fine which might be imposed by reason of its violation of section 72-219. If such were the case, Ryan's position would be well taken. While Great Northern is seeking indemnity for the consequences of a negligent act made criminal by statute, it was not the object of the agreement to exempt Great Northern from its responsibility for the violation of this or any other statute.

There are no Montana cases in point construing section 13-802. This section was taken from Section 1668 of the Civil

---

8. Cases supporting this rule, where the facts are comparable, include Cacey v. Virginian R. Co., 4 Cir., 1936, 85 F.2d 976; Southern Pacific Co. v. Morrison-Knudsen Co., 1959, 216 Or. 398, 338 P.2d 665; Chicago Great Western Ry. Co. v. Farmers Produce Co., D.C.N.D.Iowa, E.D.1958, 164 F.Supp. 532, where the railroad had granted to a tenant of Iowa land a private crossing license for convenience of the tenant and its customers, with a provision that the tenant would indemnify the railroad on account of injuries to any person arising out of the maintenance of the crossing, regardless of negligence. In holding that the indemnity provision was effective, the court called attention to Restatement, Contracts § 575(1) (b) and said: "In the present case the Railway Company is a common carrier. However, in connection with the contract here involved it was not acting in its capacity of a common carrier; it was acting in its capacity as a property owner." At page 538.

Code of California. While that section has been construed in a number of cases there are no cases precisely in point, and each party urges that the California construction supports its position. Defendant relies upon Werner v. Knoll, 1948, 89 Cal.App.2d 474, 201 P.2d 45, 46, an action by a tenant to recover damages for the wrongful death of his son, who sustained fatal injuries while operating a tractor. Plaintiff alleged that the injuries were caused by a latent defect in the tractor known to the landlord but not to the tenant or his son. The court held valid the tenant's agreement that the landlord should not be liable for any damage resulting from personal injuries sustained by any person in or about the leased premises "from any cause whatsoever", and that the tenant would save and keep the landlord free and harmless of and from such liability. With respect to section 1668 the court said in part: "Clearly said section 1668 does not declare unlawful all contracts, the object of which is to exempt individuals from the consequence of their own acts, but only those contracts which would exempt one from the consequences of his own fraud, willful injury or violation of law whether willful or negligent."

Plaintiff contends that Werner v. Knoll has been distinguished and its ruling eroded by later California cases, including in particular Butt v. Bertola, 1952, 110 Cal.App.2d 128, 242 P.2d 32 and Barkett v. Brucato, 1953, 122 Cal.App.2d 264, 264 P.2d 978, and that under those decisions the indemnity agreement here is invalid since it involves an affirmative act of negligence on the part of Great Northern, i. e., "active" as distinguished from "passive" negligence. It should be noted, however, that in both of these California cases the court was construing a general exemption clause, and not one which expressly made the indemnitor liable for the indemnitee's negligence.[9] Where the contract specifically provides for indemnity for the indemnitee's negligence, the distinction between "active" and "passive" negligence is not recognized. In Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 569, 78 S.Ct. 438, 442, 2 L.Ed. 2d 491, the United States Supreme Court said: " * * * in the area of contractual indemnity an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate".[10] The California cases upon which plaintiff relies are not applicable in view of the express provision for indemnity "whether due or not due to the negligence of Great Northern * * * "[11]

In Pettit Grain & Potato Co. v. Northern Pac. Ry. Co., 1948, 227 Minn. 225, 35 N.W.2d 127, a lessee had agreed to indemnify the railroad for any loss occasioned by fire or sparks from locomotives or other causes incident to the operation of the railroad's trains, whether or not such loss was the result of the negligence of the railroad's employees. It was con-

---

**9.** This is clear from the following language in Butt v. Bertola (242 P.2d at page 40) and quoted with approval in Barkett v. Brucato (264 P.2d at page 989) : " * * * (T)he trend of decisions is to exclude from such general clauses the exemption of a landlord from the consequences of his own affirmative negligence; i. e., a species of exemption not intended by the parties unless clearly and in more specific terms expressed * * *."

**10.** See also Southern Pacific Co. v. Morrison-Knudsen Co., 1959, 216 Or. 398, 338 P.2d 665, 671, and cases there cited.

**11.** Section 1668 of the California Civil Code was also construed by the California Supreme Court in Morrill v. Nightingale, 1892, 93 Cal. 452, 28 P. 1068, 1070, where notes had been given by the defendant as security for repayment of funds embezzled from plaintiff and with the understanding that criminal proceedings would be dismissed and the claim settled. In denying recovery, the court held that the notes were executed in fear of, and to procure immunity from, arrest, and accordingly were void. The court held further that the "contract entered into was forbidden by section 1668 of the Civil Code, one of its objects being, indirectly at least, to relieve the defendant Nightingale from responsibility for a violation of the law". This case is clearly distinguishable and illustrates the type of contract where a statute such as R.C.M.1947, § 13–802 is applicable.

tended that this provision was invalid by reason of a statute requiring railroad companies to equip locomotives with spark arresters and subjecting the railroad to penalty for violation and providing that the employees responsible for the violation would be guilty of a misdemeanor. While the case did not involve a statute such as R.C.M.1947 section 13–802, the case does set forth clearly the distinction between a bargain for protection from consequences of a negligent act, even though the act is made a crime by statute, and bargains which involve the commission of a crime, "either as a consideration therefor or in the performance thereof" or bargains which tend to the violation of law.[12] The opinion also calls attention to the fact that the alleged act there, as here, was "a remote and undesired one which might happen in the future without intentional participation of the parties".

The court in Pettit v. Northern Pacific also calls attention to cases holding that public policy permits railroads to procure insurance to protect themselves and quotes with approval from Northern Pac. Ry. Co. v. Thornton Bros. Co., 206 Minn. 193, 288 N.W. 226, 228: "Neither law nor public policy prevents the ordinary contractor from buying from a third party indemnity from the pecuniary result of his own negligence. That is legitimate as insurance. How does the same process, with identical result, become illicit simply because they are those of the original and basic contract rather than a collateral one for conventional insurance?" (35 N.W.2d at page 133) This comment is particularly pertinent in the instant case, where the lease agreement also specifically provides that Ryan shall

obtain and keep in force a liability policy "protecting Great Northern" against loss on account of injuries growing out of the business conducted by Ryan on the property or the use and occupancy of the property by Ryan.

It is my conclusion that the indemnity provisions in the lease are valid and cover the action instituted by Mrs. Burditt. Defendant's motion for summary judgment is granted.

12. The court said in part: "It was, therefore, permissible as a matter of public policy for a railroad company and a lessee of part of its right of way to stipulate in the lease for the former's exemption from liability for loss caused by fire set by its locomotives, even though such fire might be the consequence of acts of the railroad company's servants made criminal by statute. Such a lease provision does not stipulate for the commission of any criminal act or involve participation in one, nor does it tend to encourage such conduct. It does not provide for indemnity against punishment for the crimes of the company's servants or for the heavy penalty to which a company is subject for violation of the statutes. Likewise, it has no tendency to lessen the company's performance of its duties as a common carrier * * *." (35 N.W.2d at 133).