Argued and submitted February 5, reversed and remanded March 17, 1999

Anna STEELE,
Personal Representative of the Estate of
William Jameson, Deceased,
*Appellant,*

*v.*

MT. HOOD MEADOWS OREGON, LTD.,
An Oregon limited partnership,
*Respondent.*

(9707-05394; CA A102513)

974 P2d 794

J. Michael Alexander argued the cause for appellant. With him on the briefs was Burt, Swanson, Lathen, Alexander & McCann.

Brad C. Stanford argued the cause for respondent. With him on the brief was Farleigh, Wada & Witt.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

Armstrong, J., concurring.

## KISTLER, J.

On cross-motions for summary judgment, the trial court ruled that a release printed on the back of a ski-lift ticket barred plaintiff's wrongful death action. The court accordingly granted defendant's motion, denied plaintiff's motion, and entered judgment for defendant. We reverse and remand.

On January 28, 1996, William Jameson went skiing at Mt. Hood Meadows with his brother and two friends. They bought day passes at the lift ticket booth. A day pass is relatively small, approximately three and a quarter by four inches in size. One side of the pass permits the holder to ski at Mt. Hood Meadows for a portion of the day. There is a burgundy border at the bottom of the pass. Printed within the border is a direction to the purchaser to read the "contract of release and indemnification agreement, terms and conditions, and assumption of risk notices" on the other side of the pass.

The other side of the pass provides:

"Skiing Is a Hazardous Sport
"The purchaser or user of this ticket accepts and assumes the inherent risks of skiing including man-made objects, changing conditions, natural obstacles, weather, and other skiers. (ORS 30.970-30.990)
"All Injuries Must Be Reported
"to the Area Medical Clinic

"Contract of Release and
"Indemnification Agreement
"In consider[ation f]or lift access, the holder of this lift ticket agrees to [re]lease and indemnify Mt. Hood Meadows from any claims for personal injury and loss of/or damage to property arising in connection with or resulting from the use of this ticket or the area facilities.
"Terms and Conditions
"Mt. Hood Meadows is not responsible for loss or theft of this ticket. Good date of valuation only. Warning: This ticket may be removed for fast, discourteous, or reckless

skiing and for failure to obey posted closures.
Non-Transferable, non-refundable, void if detached."[1]

Two signs at the ski resort called attention to the terms printed on the back of the pass. First, Mt. Hood Meadows posted small signs next to the ticket windows where day passes are sold. Those signs state "Additional terms stated on lift ticket" and describe how to attach the ticket. Second, larger signs are posted on the ticket booths and in the rest rooms. Those signs are headed by the word "IMPORTANT" in red, capital letters. They then divide into three parts. The first part states in smaller letters: "Please read the contract of release on your lift ticket. *You are responsible for your own safety (ORS 30.970).*" (Emphasis in original.) The second part sets out the "Skier's Responsibility Code," which consumes most of the sign. The last part of the sign states: "Please report any injury to the ski area operator immediately. Failure to notify the ski area operator by certified mail within 180 days of discovery of the injury may bar a claim for injuries (ORS 30.980)."

While Jameson was skiing at Mt. Hood Meadows, he suffered injuries that allegedly led to his death. Jameson's sister brought a wrongful death action against Mt. Hood Meadows on behalf of her brother's estate claiming that Mt. Hood's negligence had caused his death. More specifically, the complaint alleges that Jameson's death was the result of Mt. Hood Meadows' negligent failure to warn skiers of a hazard "when it was reasonably expected that skiers would be recreating in this area."[2] Mt. Hood Meadows moved for summary judgment on the ground that the release on the back of the day pass barred plaintiff's wrongful death action. Plaintiff filed a motion for partial summary judgment, claiming that the release did not bar her negligence claim. As noted

---

[1] We have not attempted to reproduce the type size and capitalization of the original release. Our holding turns on whether the release is ambiguous; on that point, the wording not the type size matters.

[2] Because neither party moved for summary judgment on the underlying question of negligence, we quote the allegations in the complaint solely to put the issues raised on appeal in context. We express no opinion on the merits of plaintiff's negligence claim.

above, the trial court granted defendant's motion, denied plaintiff's, and entered judgment for defendant.

On appeal, plaintiff assigns error to both the ruling granting defendant's summary judgment motion and the ruling denying her motion for partial summary judgment. She raises three issues in support of both assignments of error: (1) that no contract of release was formed; (2) that even if a contract were formed, it was contrary to public policy; and (3) that the terms of the release are ambiguous. Because we agree that the release is ambiguous, we do not reach the first two issues plaintiff raises.

■ The governing principles are well-established. *See Estey v. MacKenzie Engineering Inc.*, 324 Or 372, 376-77, 927 P2d 86 (1996) (summarizing cases). When one party seeks to contract away liability for its own negligence in advance of any harm, the intent to do so must be " 'clearly and unequivocally expressed.' " *Estey*, 324 Or at 376 quoting *Transamerica Ins. Co. v. U.S. Nat. Bank*, 276 Or 945, 951, 558 P2d 328 (1976)). In determining whether a contract provision meets that standard, the court has considered both the "language of the contract" and "the possibility of a harsh or inequitable result that would fall on one party" if the other were immunized from the consequences of its own negligence. *Estey*, 324 Or at 376. The latter inquiry turns on the "nature of the parties' obligations and the expectations under the contract." *Id.* at 376-77. Because the court's application of that test sheds light on its meaning, we discuss two relevant cases.

In *Estey*, a home purchaser entered into an inspection contract with an engineering company. One section in their contract provided that "[t]he liability of [the engineering company] and the liability of its employees are limited to the Contract Sum." 324 Or at 374. The court held that that limitation was not sufficient to immunize the company from liability for its own negligence. The court reasoned that the limitation reasonably could be understood as applying only to liability for breach of contract or to the company's "reasonable failure to discover latent defects." *Id.* at 378-79. It did not necessarily include a limitation on liability for the engineering company's own negligence, a conclusion that was buttressed by the fact that a home purchaser who was relying

on the engineering report would have been unlikely to have limited his ability to recover for the company's negligence. *Id.* at 379.

Similarly, in *Southern Pac. Co. v. Layman*, 173 Or 275, 145 P2d 295 (1944), a case *Estey* followed, Southern Pacific agreed to give a landowner the right to put a road across its tracks in return for the landowner's agreement to indemnify the railroad "against any and all loss, damage, injury, cost and expense of every kind and nature from any cause whatsoever" arising from the use of the crossing. *Id.* at 276-77. When one of Southern Pacific's trains negligently hit a harvesting machine using the crossing, the court held that the agreement was not sufficient to shift liability for the railroad's negligence to the landowner. Absent a specific reference to negligence, the court declined to find that the landowner would have assumed the risk of the railroad's negligence in return for the ability to cross its tracks. *Id.* at 282-83. *Compare So. Pac. Co. v. Morrison-Knudson Co.*, 216 Or 398, 412-15, 338 P2d 665 (1959) (reaching a different conclusion based on the parties' equality of bargaining position and the differing nature of Morrison-Knudson's activity).[3]

In this case, the release on the back of the lift ticket provides that the "holder of this lift ticket agrees to release and indemnify Mt. Hood Meadows from any claims for personal injury * * * arising * * * from the use of this ticket." The release does not specify whether the phrase "any claims for personal injury" includes claims for personal injury arising from Mt. Hood Meadows' negligence or whether it is limited to claims for personal injuries arising from other causes. *Compare Estey*, 324 Or at 378-79 (limitation on "liability" that did not refer to negligence insufficient because it could reasonably be interpreted as only limiting company's liability

---

[3] In *Cook v. Southern Pac. Transp. Co.*, 50 Or App 547, 551-53, 623 P2d 1125, *rev den* 291 Or 1 (1981), this court explained that when an indemnification agreement refers to negligence, the considerations noted in *Layman* and *Morrison-Knudson* do not apply. If there is no specific reference to negligence, however, then the following considerations come into play: "(1) the relative status of the parties, particularly, in a financial sense; (2) the relative scope of the privilege accorded [the indemnitor]; and (3) the degree of additional liability assumed by the [other party] by reason of the privilege conferred on the indemnitor." *Id.* We note that the relevant considerations may vary depending on whether the parties have entered into an indemnification agreement or a release.

for other kinds of wrongs), *with Harmon v. Mt. Hood Meadows*, 146 Or App 215, 218 n 1, 932 P2d 92 (1997) (season pass sufficiently clear because it specifically released Mt. Hood Meadows from any and all liability for negligence). To be sure, a release need not always specifically refer to negligence to bar a negligence claim, *Estey*, 324 Or at 378, and it might be a close question whether the text of the release—standing alone—would be sufficient to bar plaintiff's negligence claim here. *Estey*, however, directs us to consider the "nature of the parties' obligations and the expectations under the contract" as well as the "language of the contract" in determining whether the parties' intent is clear and unequivocal. That inquiry leads us to conclude that the release is ambiguous for three reasons.

■    First, immediately before the language of the release on which Mt. Hood Meadows relies, it is stated on the ticket that the "user of this ticket accepts and assumes the inherent risks of skiing including man-made objects, changing conditions, natural obstacles, weather, and other skiers." Additionally, the user is told that "all injuries must be reported to the area medical clinic."[4] Each risk of injury that the ticket identifies stems from some cause other than the ski resort's own negligence. They are, in the words of the ticket, injuries resulting from the "inherent risks of skiing." Given the ticket's explicit focus on injuries resulting from the inherent risks of skiing, the ticket holder reasonably could have understood that the phrase "any claims for personal injuries" referred to any claims for injuries arising from those risks, not from the ski operator's negligence.

That interpretation would be consistent with ORS 30.970 to ORS 30.990, which are cited on the ticket. Those

---

[4] This language is relevant to the meaning of the release for two reasons. First, defendant argues that the release is one of the terms of the contract that was formed when Jameson used the ski-lift ticket. If defendant is correct, it follows that the other portions of that contract, such as the notice that precedes the release on the back of the ticket, bear on the release's meaning. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). Second, even if the language on the back of the ticket were not part of the contract, *Estey* and *Layman* direct courts to consider "not only * * * the language of the contract, but also * * * the nature of the parties' obligations and expectations under the contract." *Estey*, 324 Or at 376-77; *see Cook*, 50 Or App at 552-53.

statutes "bar recovery for an injury caused solely by an inherent risk of skiing [but do not preclude recovery] if the injury is caused by a combination of an inherent risk of skiing and operator negligence." *Jessup v. Mt. Bachelor, Inc.*, 101 Or App 670, 673, 792 P2d 1232, *rev den* 310 Or 475 (1990); *accord Pierce v. Mt. Hood Meadows Oregon Ltd.*, 118 Or App 450, 454-55, 847 P2d 909, *rev den* 317 Or 583 (1993). Because the ticket directs the holder's attention to the "inherent risks of skiing" and cites a statutory scheme that leaves skiers free to sue for injuries caused by operator negligence, a ticket holder reasonably could have understood that he or she was only releasing any claims for personal injury that resulted from those inherent risks.[5]

■        A second factor supports that conclusion. Mt. Hood Meadows relies on the large signs posted on the ticket booths and in the rest rooms to put its guests on notice that they should "read the contract of release on [their] lift ticket[s]." Those same signs, however, also ask guests to "report any injury to the ski area operator immediately" and provide that "[f]ailure to notify the ski area operator by certified mail within 180 days of discovery of the injury may bar a claim for injuries (ORS 30.980)." The last sentence implies that Mt. Hood's guests retain some claims for their injuries, a proposition that is at odds with the notion that the release bars all claims for personal injuries whatever their cause. Moreover, the reference to ORS 30.980 suggests that the claims guests retain are claims arising from the ski operator's own negligence. *See Jessup*, 101 Or App at 673.

Finally, it is difficult to see a meaningful distinction between this case and *Layman*. Without a specific reference to negligence in the release, we can no more assume that a skier would understand that he or she was giving up a claim for personal injuries arising from Mt. Hood's negligence in return for a day's skiing than the *Layman* court was willing to assume that a landowner understood that it was assuming the consequences of the railroad's negligence in return for

---

[5] We recognize that ORS 30.990 requires ski area operators to notify skiers of those risks, and Mt. Hood Meadows may simply have been complying with that statute when it printed the notice on the back of its lift ticket. The presence of that notice, however, created an ambiguity that required greater specificity in the terms of the release.

being permitted to cross its tracks. In both cases, the potential loss is great and the privilege received in return is relatively small. Moreover, there is no evidence of either bargaining or of equality of bargaining positions that would suggest that Jameson reasonably would have understood (any more than the landowner in *Layman*) that he was giving up any claims for injuries that were caused by Mt. Hood Meadows' own negligence. We conclude that because the release on the back of the lift ticket does not "clearly and unequivocally" reflect the parties' intent to absolve Mt. Hood Meadows of the consequences of its own negligence, defendant's motion for summary judgment should have been denied.

■ ■     The remaining issue is whether plaintiff's cross-motion for partial summary judgment should have been granted. As noted above, plaintiff moved for partial summary judgment claiming that the release could not be enforced, and she has assigned error on appeal to the ruling denying her motion. As a general rule, if a contract term is ambiguous, its meaning becomes a question for the factfinder—a proposition that would ordinarily preclude summary judgment for either party. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347-48, 876 P2d 761 (1994); *cf. Yogman*, 325 Or at 363-66 (interpreting ambiguous contract term on summary judgment when there was no relevant extrinsic evidence). In *Estey*, however, the court reaffirmed that when a contract purports to release one party from liability for its own negligence, any ambiguity will be construed against the drafter. 324 Or at 376 (quoting *Transamerica Ins. Co*, 276 Or at 951).[6] Having found the limitation on liability in that case to be ambiguous, the court in *Estey* did not remand to allow the factfinder to determine what the parties intended. *See* 324 Or at 379. Rather, it concluded that "the

---

[6] *Estey*'s reasoning on this issue may be subject to two different interpretations. Its quotation from *Transamerica Ins. Co.* supports the interpretation noted above: When a party seeks to avoid liability for its own negligence, any ambiguity in the release will be interpreted against the drafter. Alternatively, *Estey* could be read for the proposition that any release that does not "clearly and unequivocally" reflect an intent to release one party from the consequences of its own negligence is simply ineffective regardless of who drafted it. Because Mt. Hood Meadows drafted the release in this case, both rationales lead to the same conclusion and we need not decide which rationale underlies *Estey*'s holding.

limitation of liability clause * * * does not bar plaintiff's negligence claim." *Id.* Following *Estey*, we construe the ambiguity in the release against the drafter and hold that the release does not bar plaintiff's wrongful death action based on the ski operator's alleged negligence.

Reversed and remanded.

**ARMSTRONG, J.,** concurring.

I agree with the majority's conclusion that the contractual provision that purportedly released all claims against defendant for injuries sustained by Jameson is ambiguous and, as a consequence, inapplicable to plaintiff's claim. I write separately to highlight an issue about the enforceability of the provision that the parties raised but the majority does not reach.

In *Illingworth v. Bushong*, 297 Or 675, 692-93, 688 P2d 379 (1984), the Supreme Court held that a Uniform Commercial Code (UCC) provision on the recovery of liquidated damages applies to non-UCC contracts. The court reasoned that the legislature's preeminent role as a policy maker made it appropriate to look to it as a source of policy on common-law issues that historically have been resolved by the courts.

That approach appears to be particularly appropriate in resolving the common-law issue whether a provision in a consumer contract that limits liability for personal injuries is enforceable. The determination whether such a provision is enforceable often turns on whether its enforcement would offend public policy. *See, e.g., Harmon v. Mt. Hood Meadows, Ltd.*, 146 Or App 215, 221-22, 932 P2d 92 (1997). The UCC addresses that policy issue by providing that

> "[c]onsequential damages may be limited or excluded [in contracts for the sale of goods] unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

ORS 72.7190(3). Under *Illingworth*, the policy embodied in ORS 72.7190(3) should apply to consumer contracts that are not subject to the UCC, such as the contract at issue here.

Applying that policy to the exculpatory provision in the parties' contract would lead me to conclude, on this record, that the provision could not be enforced against plaintiff's claim, but that policy would not necessarily prevent the enforcement of comparable provisions in other consumer contracts. The enforceability of such provisions presumably would turn on whether the evidence presented by the parties would persuade a court that enforcement would not be unconscionable. *See* ORS 72.3020.[1]

---

[1] The statutes enacted by the legislature on the liability of ski area operators for injuries caused by the inherent risks of skiing, ORS 30.970 to ORS 30.990, do not undercut the analysis. They insulate ski area operators from liability for inherent risks but not from liability for their own wrongful conduct. Hence, they do not raise any problem with the application of the *Illingworth* analysis to exculpatory provisions in contracts between ski area operators and people who use their facilities.