Argued and submitted October 9, 1998, affirmed May 19, petition for review denied October 26, 1999 (329 Or 447)

Mavis BLANCHFILL,
*Plaintiff,*

*v.*

BETTER BUILDS, INC.,
an Oregon corporation,
and Cottage Grove Fitness, Inc.,
an Oregon corporation,
*Defendants.*

BETTER BUILDS, INC.,
an Oregon corporation,
*Appellant,*

*v.*

Gregory S. BLANCHFILL,
dba Cottage Grove Fitness
and Cottage Grove Fitness, Inc.,
an Oregon corporation,
*Respondents.*

(16-95-08434; CA A99382)

982 P2d 53

Larry A. Brown argued the cause for appellant. With him on the briefs were John F. Kilcullen, Thomas A. Ped and Brown, Roseta, Long, McConville, Kilcullen & Carlson.

Joel S. DeVore argued the cause for respondent. With him on the brief was Luvaas, Cobb, Richards & Fraser, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

De Muniz, P. J., dissenting.

## HASELTON, J.

Defendant, Better Builds, Inc., appeals from a judgment on a third-party complaint for contractual indemnity against Cottage Grove Fitness, Inc. (CGF). Better Builds assigns error to the trial court's determination that it is not entitled to indemnity from CGF. Better Builds further asserts that, because it is entitled to indemnity, the trial court erred in entering a supplemental judgment for CGF on CGF's claims for contribution and contractual attorney fees against Better Builds. We conclude that the trial court correctly determined that broad "hold harmless" language in the parties' lease agreement did not entitle Better Builds to be indemnified for its own negligence and strict liability. Consequently, we affirm.

Viewed in the light most favorable to the prevailing party, CGF, the material facts are as follows: CGF, a fitness center located in Cottage Grove, opened in October 1993. Gregory Blanchfill, a chiropractor, was CGF's principal owner. Better Builds operates fitness centers in North Bend and Coquille and manufactures exercise equipment for its own use and for sale and lease to others. Better Builds' president, Byron Beebe, has been involved in the exercise equipment business since the mid-1980s.

In the spring of 1993, Beebe and Blanchfill, as principals for their companies, negotiated and orally agreed to the terms of a lease arrangement. Under that agreement, Better Builds was to manufacture and lease exercise equipment to CGF, with CGF making total lease payments of $28,702 over a term of 36 months, with a $100 buy-out at the end of the term. In November 1993, after Better Builds had manufactured and delivered some of the equipment to CGF, Beebe presented Blanchfill with a Stevens-Ness preprinted form lease agreement. That form agreement contained the following provision:

"The *lessee* [CGF]* * * *agrees to defend, at lessee's own expense, any and all actions brought against either or both of the parties* hereto for damages to persons or property caused by the leased property or by its operation, and *agrees to hold lessor* [Better Builds] *free and harmless of and from*

*any and all claims and demands that may arise or be occasioned to any person or to any property by or through the use of the leased property during the term of this lease or any renewal hereof."*

The lease further provided that CGF, as the lessee, would be responsible for "any and all repairs and * * * supply and pay for any and all parts and accessories needed to maintain" the equipment. Under the agreement, Better Builds, as lessor, retained the right to have "free access" to CGF's property during business hours for the "purpose of inspecting" or "watching its use and operation or of altering, repairing, improving or adding to it or determining the nature or extent of lessee's use * * *." Beebe and Blanchfill did not discuss the terms of the form lease agreement, including the "hold harmless" provision.

Among the machines that Better Builds designed, manufactured, and leased to CGF was a "45-Degree Lever Row" or "T-bar Rowing" machine. That machine, which came with no instructions for operation, was defectively designed in that the weighted metal T-bar or lever was to be placed on supporting pegs when the machine was not being used or the user was resting, but the pegs lacked safety flanges or "keepers" to prevent the heavy bar from slipping off the pegs. Several of CGF's members complained about the lever bar falling off the pegs and, after the bar fell while Blanchfill was using the machine, he had an employee call Better Builds to complain. Better Builds made some repairs to the machine but did not successfully address the bar slippage design defect. Thereafter, CGF continued to receive complaints about the lever bar falling but continued to permit its members to use the machine. CGF made no further complaints to Better Builds.

CGF placed the rowing machine in a location that required that it be moved before being used. In April 1995, as Blanchfill's wife, Mavis, was moving the rowing machine, the lever bar fell from the peg, crushing her hand. In September 1995, Mavis (plaintiff) filed a personal injury action against Better Builds, alleging claims of negligence and strict liability based on defective design and manufacture. Ultimately,[1] plaintiff alleged that Better Builds was negligent:

---

[1] The quoted allegations are from plaintiff's second amended complaint, which was the pleading before the jury.

"a)   In designing, manufacturing, distributing, leasing, and maintaining its described exercise equipment without a flange, 'keeper,' or other feature to prevent the weighted long metal bar from slipping off and falling down;

"b)   In designing, manufacturing, distributing, leasing, and maintaining its described exercise equipment that had an unreasonably large 'crush' area;

"c)   In designing, manufacturing, distributing, leasing, and maintaining its described exercise equipment without adequate instructions for its safe use; and

"d)   In designing, manufacturing, distributing, leasing, and maintaining its described exercise equipment without adequate warnings of the risk of injuries posed by it."

With respect to strict liability, plaintiff alleged that the rowing machine was defectively designed and that Better Builds had marketed the product with inadequate warnings and instructions.[2]

Better Builds answered, alleging that plaintiff's own negligence caused the accident. In addition, Better Builds alleged two third-party claims against CGF:[3] (1) a claim for contractual indemnity under the "hold harmless" provision of the lease, in the event and to the extent that Better Builds was adjudged liable to plaintiff; and (2) a claim for contribution based on CGF's comparative fault in positioning the rowing machine where it needed to be moved before use, in failing to properly supervise and instruct users, in allowing plaintiff to use the rowing machine in an unsafe manner, and in failing to maintain the machine by failing to adjust the lever bar hinge.

---

[2] Plaintiff alleged, particularly, that:

"The described exercise equipment was defective and unreasonably dangerous in that it exposed the user to an unreasonable risk of harm because it lacked a flange, 'keeper,' or other feature to prevent the long metal bar from slipping off the short metal post and falling down; it was designed in such a manner as to create an unreasonably large 'crush' area; it was distributed and leased without adequate instructions; and it was distributed and leased without adequate warnings."

[3] Better Builds also alleged the same third-party claims against Gregory Blanchfill. However, because the court subsequently dismissed Blanchfill, and Better Builds does not challenge that dismissal on appeal, our discussion pertains to CGF only.

CGF answered the third-party complaint, asserting that it was not responsible for the accident; that the contractual "hold harmless" language was not intended to apply to Better Builds' own negligence or strict liability; and that, to so construe and apply the contractual language would be unconscionable and contrary to public policy. In addition, CGF, by a third-party counterclaim, alleged an entitlement to attorney fees under the lease's fee provision.

Plaintiff subsequently amended her complaint to include a negligence claim against CGF in addition to her original claims against Better Builds for negligence and strict liability. Plaintiff alleged that CGF was negligent:

"a)   In failing to position and maintain the described exercise equipment so that persons could use the equipment without needing to move it to a safer position;

"b)   In failing to provide adequate instructions for the safe use of the described exercise equipment;

"c)   In failing to provide adequate warnings of the risk of injuries posed by the described exercise equipment;

"d)   In making available for use a dangerously defective exercise machine;

"e)   In informing Plaintiff Mavis Blanchfill that the described exercise equipment had been fixed."

CGF answered, alleging that plaintiff's own negligence in attempting to move the rowing machine caused the accident. CGF also asserted a cross-claim for contribution against Better Builds, alleging that Better Builds' negligent design and manufacture of the rowing machine, its failure to maintain, repair, or modify the machine, and its failure to give adequate warnings and instructions all contributed to the accident.

Thus, as the case was submitted to the jury, plaintiff, CGF, and Better Builds each alleged that the accident was the result of the others' negligence (and, with respect to Better Builds, its strict liability) either singly or in combination. CGF and Better Builds agreed that, for purposes of the indemnity and contribution claims, the jury would apportion their respective fault, if any, but that the court, as trier of

fact, would determine the construction and application of the lease's "hold harmless" language.

The jury, in response to special interrogatories, determined that the accident was the result of a combination of plaintiff's own negligence, CGF's negligence, and Better Builds' negligence and provision of a defective product. The jury apportioned fault to plaintiff (10 percent), CGF (45 percent), and Better Builds (45 percent)[4] and awarded plaintiff economic damages of $82,662.02 and noneconomic damages of $30,000. After reducing the award for plaintiff's own negligence, the court entered a judgment that CGF and Better Builds were jointly liable for plaintiff's net economic damages of $74,395.82 and that each was severally liable for noneconomic damages of $13,500, representing half of plaintiff's $27,000 net recovery.

The court then considered Better Builds' indemnity claim and took evidence on the intent and enforceability of the "hold harmless" provision. Ultimately, the court denied indemnity, concluding that, because the lease language did not explicitly obligate CGF to indemnify Better Builds for its own negligence and because "the benefit extended to [CGF] under the agreement did not materially increase the risk to Better Builds," Better Builds was not entitled to indemnity. The trial court consequently entered a supplemental judgment for CGF for contribution from Better Builds and awarded CGF prevailing party attorney fees under the lease.

On appeal, Better Builds contends that the trial court erred in (1) rejecting Better Builds' claim for contractual indemnity; (2) allowing CGF's claim for contribution against Better Builds; and (3) awarding CGF attorney fees under the lease. The parties agree, correctly, that the resolution of the first assignment of error controls the other two.

Better Builds argues that it was error for the trial court to deny its claim for contractual indemnity because the lease agreement "unambiguously" obligates CGF to indemnify Better Builds for "any and all claims and demands." Better Builds further asserts that, even if the agreement is not

---

[4] In apportioning Better Builds' fault, the jury did not differentiate between the negligence and strict liability claims.

explicit in that regard, the breadth of the contractual language, when coupled with various contextual considerations, compels indemnity.[5] Better Builds' arguments on appeal, as at trial, are based entirely on *Southern Pac. Co. v. Layman*, 173 Or 275, 145 P2d 295 (1944), and its progeny. CGF's responses were, and are, also based exclusively on that analysis.[6]

■ ■   In determining whether broad contractual "hold harmless" language entitles a party to be indemnified for the consequences of its own negligence, we apply the principles expressed in *Layman*, as supplemented by our analysis in *Cook v. Southern Pac. Transp. Co.*, 50 Or App 547, 623 P2d 1125, *rev den* 291 Or 1 (1981). If contractual language clearly and explicitly provides that a party will be indemnified for a particular loss, even if caused by that party's negligence, then the inquiry ends, and the provision is enforced. *See, e.g., Layman*, 173 Or at 279-80; *Cook*, 50 Or App at 551-52. *See also Estey v. MacKenzie Engineering Inc.*, 324 Or 372, 376-79, 927 P2d 86 (1996) (construing contractual limitation of liability provision); *Steele v. Mt. Hood Meadows Oregon, Ltd.*, 159 Or App 272, 974 P2d 794 (1999) (same). If, however, the contractual language is broad but indefinite—*e.g.*, referring to "any and all claims" or "any and all liability" without reference to particular risks or to the putative indemnitee's own conduct—the court determines the scope and enforceability of thatl anguage after assessing certain broader contextual considerations:

---

[5] The parties do not suggest that the fact that Better Builds was found to be liable to plaintiff both in negligence and in strict liability is material to our analysis—*i.e.*, that differences between those theories of recovery might somehow dictate differences in the application and enforceability of the "hold harmless" provision. *Accord K-Lines, Inc. v. Roberts Motor Co.*, 273 Or 242, 541 P2d 1378 (1982) (sustaining contractual limitation of liability for strict liability). Nor does CGF contend on appeal that any contractual exculpation of Better Builds for the consequences of its own conduct would be void as against public policy. *Accord Harmon v. Mt. Hood Meadows, Ltd.*, 146 Or App 215, 219 n 3, 932 P2d 92 (1997) (noting, but not resolving, issue of whether exculpatory language that purported to relieve ski resort from consequences of its own negligence offended Oregon public policy).

[6] Neither party has argued for the application of the Uniform Commercial Code and, particularly, of ORS 72A.1080, relating to unconscionability of lease contracts. *Cf. Steele v. Mt. Hood Meadows Oregon, Ltd.*, 159 Or App 272, 281, 974 P2d 794 (1999) (Armstrong, J., concurring) (discussing application of analogous provision). We express no opinion as to the application of that provision.

"Indemnity provisions, when they appear in agreements having a primary purpose other than indemnity itself, are viewed as realistic attempts to allocate business risks among the parties and should be given a reasonable construction. * * * Like other contracts, indemnity agreements are usually to be interpreted according to the plain meaning of the language employed, where such meaning is unambiguously expressed. * * * Where the language used is ambiguous in the context of the entire contract, it must be interpreted in the light of the surrounding circumstances and the situation of the parties so as to effectuate the parties' intent." *Cook*, 50 Or App at 551.

Layman was the first Oregon decision to engage in that sort of contextual inquiry. There, a farmer contracted with the railroad to build and use a private road over the railroad's right of way. The agreement, which the railroad prepared, provided that the farmer would indemnify the railroad "against any and all loss, damage, injury, cost and expense of every kind and nature, from any cause whatsoever" arising from the use of the crossing. *Id.* at 276-77. Nearly 20 years later, one of the railroad's trains negligently struck and demolished a third party's harvesting machine at the crossing. The railroad sought indemnity from the farmer, and the Supreme Court ultimately affirmed the dismissal of that action, concluding that the contractual language did not entitle the railroad to be indemnified for the consequences of its own negligence. In so holding, despite the breadth of the contractual language, the court observed:

"The interpretation insisted upon by the plaintiff, we think, is unreasonable. It could result in subjecting a farmer to a ruinous liability arising out of the negligence of the plaintiff in the operation of its trains, an operation over which the defendant had no control. We do not believe that for the mere privilege of passing over the plaintiff's tracks the defendant intended to assume such a risk, or that the railway company intended to impose it." *Id.* at 283.

In *So. Pac. Co. v. Morrison-Knudsen Co.*, 216 Or 398, 338 P2d 665 (1959), a major construction company entered into an agreement with the railroad, allowing the installation and operation of an unloading bunker on a spur line. The agreement included hold harmless language similar to that in *Layman*, by which the company agreed to "indemnify and

save harmless Railroad * * * from all liability, cost and expense resulting directly or indirectly from the presence or use of said bunker." Thereafter, an employee of a subcontractor was injured from a fall in the bunker as a result of the concurrent negligence of both the company and the railroad. The Supreme Court concluded that the railroad was entitled to indemnity and, in so holding, derived and applied three factors from *Layman*:

> "(1) the relative status of the parties, particularly, in a financial sense; (2) the relative scope of the privilege accorded Layman; and (3) the degree of additional liability assumed by the Railroad by reason of the privilege conferred on the indemnitor." *Morrison-Knudson*, 216 Or at 412.

The court explained that those considerations all bore on the "prime" principle that, because of the "harshness" of requiring one party to indemnify for the negligence of another, broad contractual language could not be so construed unless other circumstances clearly supported such a result.

In applying those criteria, the court noted that the railroad and the company were both substantial entities. The court further emphasized (and contrasted with *Layman*) the magnitude of the company's "privilege" and the degree to which the company's on-site activities enhanced the railroad's exposure to liability:

> "All this was an accommodation to the Industry and for the Industry's sole use to facilitate delivery of cement to its construction job. There was no comparable compensating advantage to the Railroad. It created a situation wholly unlike the Railroad's operation under the Layman agreement. The success of no part of Layman's use or activities were directly or indirectly dependent upon any kind of service from the Railroad. Here, however, the Industry was dependent to a large degree upon the cooperation of the Railroad, without which the bunker would have been of little or no value to it. * * *
>
> "* * * * *
>
> "[T]he bunker, constructed and operated as it was by the Industry on railroad property, created new and latent risks and hazards for injuries to property or persons operating in

or near it. Such risks and hazards were not usual to the Railroad's ordinary operation as a common carrier. Moreover, they were risks arising from a privilege that the Railroad was not legally obligated to confer on the Industry. * * *

"* * * * *

"Thus, it will be seen that by suffering the Industry to erect and operate the bunker, the Railroad exposed itself to the hazards of an increased, immeasurable tort liability. Under the circumstances, it was only natural and the exercise of sound business judgment that the Railroad would demand protection including the consequences of its own acts." *Morrison-Knudsen Co.*, 216 Or at 413-14.

Neither *Morrison-Knudsen* nor any subsequent Supreme Court decision purports to describe the so-called "*Layman* factors" as exclusive—*i.e.*, as the sole circumstantial criteria for determining the scope and enforceability of general "hold harmless" language in commercial contracts. *See generally Estey*, 324 Or at 376-77 (noting that "harsh results" inquiry "focuses on the nature of the parties' obligations and expectations under the contract").

In *Cook*, we amplified the *Layman / Morrison-Knudsen* analysis. There, a contractor entered into an agreement to remove an abandoned station house from railroad property. That agreement provided that the contractor would indemnify and hold the railroad harmless "against all liability, cost and expense arising out of or in connection with the work to be performed by Buyer, or from the presence on, in or about the premises of Railroad by Buyer * * * regardless of any negligence or alleged negligence on the part of any Railroad employee or agent." *Cook*, 50 Or App at 550. The agreement further provided that the railroad retained the right to make necessary inspections and to undertake, at the contractor's expense, any measures necessary to insure the safety of the contractor's operations. During the contractor's removal of the building, an unknown third party moved debris so that it extended over the railroad tracks which, in turn, caused a brakeman to be injured. The railroad sought indemnity from the contractor for sums it paid the brakeman under the Federal Employers' Liability Act. The trial court granted a directed verdict for the railroad, holding that, as a matter of

law, the contract unambiguously obligated the contractor to indemnify the railroad for liability arising from the negligence of unknown third parties.

On appeal, we held that the contractor, not the railroad, was entitled to a directed verdict. We began by noting that the contractual language did not expressly address broad liability for the negligence of unknown third parties and further determined that that application of the *Layman* factors did not compel judgment for the railroad as a matter of law. In that regard, we emphasized:

> "It seems unlikely to the extent of total improbability that Cannon, who received only a six-month license to enter upon defendant's property to remove the station house and who expected to make at most $1,500 from the deal, would have agreed to hold the railroad harmless for acts of third parties beyond Cannon's control. The cost alone of defending an action would very probably exceed that expected profit." *Cook*, 50 Or App at 554.

We then considered the obverse question of whether the contractor was entitled to judgment as a matter of law. We framed that inquiry as follows:

> "Where the indemnity provision is an adjunct of a larger agreement, courts are required to construe the language of the provision in a manner which reasonably allocates between the parties the risks arising out of their underlying contractual relationship. The 'rule against harshness' serves this purpose by requiring examination of aspects beyond the mere language of the agreement where three criteria are met: (1) the language, if construed broadly, results in liability to the indemnitor which far exceeds the expected profits from the contract; (2) liability arises from acts or conditions beyond the indemnitor's control; and (3) the agreement fails to allocate specifically the particular risk from which the liability arises. If these criteria are present, the scope of the construction to be given to the indemnity clause depends on a balancing of the *Layman* factors." *Cook*, 50 Or App at 555 (citation omitted).

Applying that analysis, we concluded:

> "[Contractor] is an individual with insubstantial personal means who purchased a license to enter onto railroad property over a six-month period for the purpose of removing a

building with a maximum expected salvage value over demolition costs of $1,500. The risks from this contract are very similar to those the railroad would have incurred had it chosen to have its own crew demolish the building. The risk that third parties might foul the track was ever-present; the only 'increase' in risk was that demolition of the building provided a ready source of materials which could maliciously or negligently be used to create a hazard. The agreement is silent with respect to third-party negligence. The absence of a specific allocation of this risk to [contractor] and the harsh result of imposing liability in this case require that we construe the language to exclude coverage.

"There is an additional reason for construing the contract language against the railroad. The agreement in question is a form contract prepared by defendant and is silent on the question of third-party negligence." *Id.* at 556.

*See also Zoeller v. Burlington Northern*, 79 Or App 259, 263-64, 719 P2d 488 (1986) (generally describing *Layman* and *Cook* analysis).

There is both an overlap and a potential tension between *Cook* and *Layman / Morrison-Knudsen*. The overlap is that the first and second *Cook* factors are, in many ways, particularized expressions of the second and third *Layman* factors. That is, whether the imposition of indemnity would result "in liability to the indemnitor which far exceeds *the expected profits from the contract*," *Cook*, 50 Or App at 555 (emphasis added), is, at least in part, a function of "the relative scope of the privilege accorded [the indemnitor]." *Morrison-Knudsen*, 216 Or at 412. Similarly, whether "liability arises from acts or conditions beyond the indemnitor's control," *Cook*, 50 Or App at 550, may be closely related to "the degree of additional liability assumed by the [indemnitee] by reason of the privilege conferred on the indemnitor." *Morrison-Knudsen*, 216 Or at 412.[7]

---

[7] The third *Cook* factor—whether the agreement "allocate[s] specifically the particular risk from which the liability arises"—merely reiterates the principle of textual primacy recognized in *Layman* and, indeed, in Oregon contract law generally: If the language of the contract explicitly allocates the particular risk of loss, including by reference to the indemnitee's own negligence, then that provision is enforceable without further consideration of contextual/circumstantial factors.

The potential tension arises from *Cook's* comment that "if [the *Cook*] criteria are present," construction of the indemnity clause "depends on a balancing of the *Layman* factors." *Cook*, 50 Or App at 555. That comment, which is not amplified, could be read as suggesting some sort of dichotomy between the "*Cook* factors" and the "*Layman* factors"—*i.e.*, "if," but only if, the former are shown, can the court proceed to consider the latter. However, *Cook* itself does not follow that sort of threshold/conditional approach; rather, the balance of the opinion melds its discussion of evidence bearing on the "*Cook* factors" with, and as support for, its overarching conclusion that "[t]he result of application of the *Layman* factors is quite clear." *Id.* at 556.

■■ Thus, read reasonably, *Layman* and *Cook* in combination require that, when a larger agreement includes broad indemnification language that does not specifically allocate the particular risk from which the liability arises, the court, in determining the scope and application of that language, is to consider at least the following factors:

- The parties' relative status, including their financial strength, their sophistication and appreciation of potential risks, and the dynamics of their bargaining, particularly whether the indemnification language was specifically negotiated.

- The extent to which the putative indemnitor's activities exposed the putative indemnitee to new or different liability, both generally and with respect to the particular risk—and, conversely, the extent to which the particular liability arose from circumstances, including the indemnitee's conduct, that were beyond the indemnitor's control.

- The putative indemnitor's reasonably anticipated benefit ("privilege" or "profit") under the agreement versus its concomitant potential exposure to liability for the indemnitee's conduct.[8]

---

[8] Some aspects of the *Layman / Cook* analysis—*e.g.*, reference to the contractual text and generalized context—comport with general Oregon law governing contractual construction. *See, e.g., Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).

Other aspects—*e.g.*, the particularized assessment of relative risk and benefit—may be unique to the construction of limitations of liability and

Here, the parties' agreement did not explicitly address Better Builds' strict liability or negligence, but the indemnification language was sufficiently broad and unqualified to, at least arguably, encompass that liability. Accordingly, we assess the contextual factors, viewing the evidence in the light most favorable to the trial court's ultimate determination that Better Builds was not entitled to indemnity to the extent of its own proportionate fault.

■        Better Builds and CGF were both small and relatively unsophisticated companies. *Compare Morrison-Knudsen* (enforcing indemnity agreement where indemnitor was large and sophisticated entity with years of experience with the risks associated with its operations). The parties did not discuss apportionment of risk, much less specifically negotiate the indemnity provision. Rather, that provision was merely included in a preprinted form that Better Builds provided.

■        CGF's leasing and use of the exercise equipment did not expose Better Builds to a risk of liability materially different from that to which it would ordinarily have been subjected. Better Builds is in the business of manufacturing and selling exercise equipment. Inherent in that business is the risk of physical injury due to product defect. As a qualitative matter, that risk is no different if the equipment is sold to an individual or leased to a health club. To be sure, depending on the nature of the defect, increased use of the product in the health club context may, as a statistical matter, increase the likelihood of an injury-producing accident. But the essential nature of the risk—in this case, the risk of injury from the heavy lever bar falling from the unguarded pins—remains

---

indemnification provisions. The principled application of those factors requires that they be applied prospectively, as a measure of the parties' reasonable expectations at the time of contracting, rather than retrospectively, with the benefit of "20/20 hindsight" following the loss giving rise to the indemnity claim.

Finally, the relative status of the parties may be probative both of general context and, at least implicitly, of concerns pertaining to overreaching and unconscionability. We say "at least implicitly" because, although disparities in bargaining position and use of standard form contracts are standard fare in unconscionability cases, *Layman* and its progeny do not purport to invalidate contractual language as being unconscionable. Rather, working from the premise that objectively reasonable parties would not have intended unduly "harsh" results, the cases construe imprecise contractual language to comport with that principle of "reasonable expectation."

the same.[9] *See, e.g., Gray Line Co. v. Goodyear Tire & Rubber Co.,* 280 F2d 294, 300 (9th Cir 1960) (where tire company leased tires to bus company and tire subsequently failed, injuring a passenger, tire company was not entitled to indemnity under broad "hold harmless" language because, *inter alia,* "the risk to Goodyear would be substantially the same whether it sold tires outright to Gray Line or whether it merely supplied them under the mileage contract") (applying Oregon law).

Better Builds asserts, nevertheless, that "for all practical purposes [it] had relinquished control over the row[ing] machine"; that, under the lease, CGF was solely responsible for maintaining the equipment; and that, as the jury determined in the primary litigation, CGF was equally at fault for the accident. To the extent that Better Builds is asserting that it had no control over the equipment, it is wrong. Specifically, Better Builds retained the right of free access to CGF's property to inspect the equipment and to make "repair[s], improve[ments] or add[ ] to" the machine. Thus, the lease expressly provided Better Builds with the opportunity to control its exposure to liability during the lease period. *Compare Cook,* 50 Or App at 555 (neither indemnitee nor indemnitor had control over the acts of a third party, whose conduct gave rise to the indemnitee's liability under the FELA). Conversely, although CGF could, and did, request equipment *repairs,* product *design* was a matter over which CGF had no control.

Better Builds is correct that the jury found that CGF was equally at fault. However, as framed by the pleadings, CGF's fault was principally in failing to alleviate the risk—in failing to instruct and to warn its members—and not in creating it. Thus, like the farmer in *Layman,* and unlike Morrison-Knudsen, CGF's use of the leased equipment did not expose Better Builds to materially new or different liability.

Finally, the benefit to CGF under the contract—the entitlement to use Better Builds' equipment, including the rowing machine—is uncertain. Although CGF was going to

---

[9] There is no suggestion that CGF modified the rowing machine while it was in its possession.

pay $28,000 for the 3-year lease followed by a $100 buy-out, CGF's benefit under that arrangement was not susceptible to some sort of "maximum potential profit" quantification. *Compare, e.g., Cook*, 50 Or App at 556 (noting that contractor's "maximum expected salvage value over demolition costs" was $1,500). There was, for example, no evidence that use of Better Builds' equipment, as opposed to some other supplier's, would increase CGF's membership or revenues. Conversely, given the severity of injuries that can result from defective exercise equipment, CGF's potential indemnity liability was considerable.

In sum, none of the *Layman / Cook* contextual factors clearly favors indemnity. At best, some are neutral. The others indicate that, in the totality of the circumstances, an objectively reasonable equipment lessee would not have assumed liability for injuries from defectively designed equipment and that an objectively reasonable manufacturer/supplier/lessor would not have expected to be indemnified for its own fault in that regard. The trial court did not err in concluding that the broad hold harmless language in the lease agreement did not obligate CGF to indemnify Better Builds for its own fault.

Because we affirm on the first assignment of error, we affirm on the remaining assignments as well. *See* 160 Or App at 533.

Affirmed.

**DE MUNIZ, P. J.,** dissenting.

It may be that my quarrel here is less with the majority itself than with *Southern Pac. Co. v. Layman*, 173 Or 275, 145 P2d 295 (1944), *Cook v. Southern Pac. Transp. Co.*, 50 Or App 547, 623 P2d 1125, *rev den* 291 Or 1 (1981), and the related authority on which the majority relies. The notion that contractual hold harmless and indemnity provisions are not inherently enforceable according to their terms may be an attractive one in a case like *Layman*, where the protagonists were a railroad and a farmer who got proportionately little benefit from the contract binding him to indemnify the railroad for its own negligence. However, in a case such as this, where parties with equal bargaining power

use such a provision to allocate the risk of liability in a mutually desired commercial arrangement, that notion may reflect a wholly unjustifiable expansion of the appropriate judicial role in an action to enforce a contract.

Moreover, the apparent premise of the *Layman-Cook* approach is that hold harmless and indemnity provisions tend to be worded broadly and to encompass after-the-fact, liability-producing events that the parties did not anticipate at the time of contracting. Although that premise is correct, it does not support a general rule of nonenforcement. Such provisions are worded broadly because breadth is their intended purpose. The *sine qua non* of a general risk-allocation provision is to cover future contingencies generally and to encompass events that cannot be foreseen in all of their specifics at the time the contracts are negotiated.

Even given the *Layman-Cook* rationale, however, I do not agree with the majority's conclusion here. The majority states:

> "Better Builds and CGF were both small and relatively unsophisticated companies. * * * The parties did not discuss apportionment of risk, much less specifically negotiate the indemnity provision. Rather, that provision was merely included in a preprinted form that Better Builds provided." 160 Or App at 541.

Although I agree with the majority's factual recitations in that statement and elsewhere, I disagree with the implication that the majority appears to find in the facts. In contrast, what I find significant is that Better Builds and CGF had equal bargaining power; that they used a preprinted lease agreement form that was prepared by Stevens-Ness and not by either party; and, as the majority notes earlier in its opinion, the parties did not discuss the terms of the form lease agreement *at all*. They did not single out the hold harmless provision for inattention. *See* 160 Or App at 530. The situation here differs from the one in *Cook*, 50 Or App at 556, where we construed the "form contract prepared by" the railroad against it. In *Cook*, there was a radical disparity in

bargaining power, and the form contract was actually prepared by the party with the greater power. In this case, neither of those factors is present. Further, the fact that the parties did not specifically discuss the hold harmless provision here lends no greater support to the inference that they did not intend what it says than that the lease agreement, as a whole, was unintended. The parties did not talk about any of its terms. I find nothing in *Layman* or *Cook* that requires us to presume, as the majority effectively does, that parties with equal bargaining power did not intend to include a term that appears in their written contract simply because they did not single it out for oral negotiation.

My more significant disagreement, however, is with the majority's statement that

> "the benefit to CGF under the contract—the entitlement to use Better Builds' equipment, including the rowing machine—is uncertain. Although CGF was going to pay $28,000 for the 3-year lease followed by a $100 buy-out, CGF's benefit under that arrangement was not susceptible to some sort of 'maximum potential profit' quantification. *Compare, e.g., Cook*, 50 Or App at 556 (noting that contractor's 'maximum expected salvage value over demolition costs' was $1,500). There was, for example, no evidence that use of Better Builds' equipment, as opposed to some other supplier's, would increase CGF's membership or revenues. Conversely, given the severity of injuries that can result from defective exercise equipment, CGF's potential indemnity liability was considerable." 160 Or App at 542-43.

Contrary to the majority's understanding, the benefit that CGF obtained is not uncertain; the benefit was the procurement of the essential equipment that CGF uses to conduct its business. Unlike *Layman* and *Cook*, where, respectively, the farmer received a small ancillary supplement to his farming income and the contractor was hired for a small incidental job, the contract in this case related to the central business operations of both parties. Consequently, this case is doomed from the outset to fail the tests that the majority administers, based on the analysis and the terminology in *Cook*, because that analysis and terminology are meaningless as applied to the facts of a case such as this.

Every step in the majority's risk-benefit analysis, as to both parties, serves to illustrate my point. For example, the majority's observation that there was no evidence that CGF's membership and revenues were increased by the use of "Better Builds' equipment, as opposed to some other supplier's," 160 Or App at 543, is much like saying that, because CGF might have attracted more customers in Portland than Cottage Grove, it gained no ascertainable benefit by the contract through which it owns or leases its business location in the latter city. Both the majority's actual statement and the one to which I liken it are wrong because the benefit to CGF in both instances is the procurement of a fundamental component of the operation of its business: a place to conduct the business and the stock-in-trade with which to conduct it. The fact that a different business location or different equipment might have been more advantageous in no way alters the benefit that CGF has obtained through the contracts reflecting its basic management decisions as to where and how to carry out its essential business operations.

Also misplaced are the majority's observations that the likelihood of injury and resulting liability from defective equipment are potentially great to CGF, although Better Builds' liability risk is no greater with CGF than some other party as the lessee and operator of the equipment. It is of course true that a severe injury to a patron could expose CGF to more liability than the equipment *as machinery* is worth; however, it is also true that, without exercise equipment, CGF cannot operate a business in which to have patrons. The risk is inherent in the business that requires the equipment as much as it is in the equipment itself. Similarly, the fact that Better Builds would have no greater exposure to liability if it leased the equipment to others instead of to CGF is an incident of its business. The equipment carries an intrinsic risk with it wherever it goes. That is not a compelling reason for foreclosing Better Builds from seeking to spread that fundamental risk of its business to its lessees, whether CGF is or is not among them.

In sum, I think that the majority attempts to transport both the general rationale and the analytical particulars of *Layman* and *Cook* beyond the point where they have any logical application. The contract here is between two parties

that have equal bargaining strength, and it provides the benefits and fosters the risks that are essential to and inherent in the businesses in which both parties are engaged. In my view, there is no reason why the courts should not give effect to the risk allocation provision to which they have agreed. I therefore respectfully dissent.[1]

---

[1] One other matter should be emphasized. Although the underlying action in this case arises out of a personal injury, the issue before us does not involve a waiver of liability by, or the ability of, a person who has suffered injury to recover damages. Rather, the contractual provision that is in question here relates only to which of the contracting parties is responsible for the damages. The risk that the contract allocates is a purely commercial one in the context of a consensual commercial arrangement between the parties.